**Bonnie MANTOLETE,**
**Plaintiff-Appellant,**

v.

**William G. BOLGER, in his capacity as**
**Postmaster General, United States**
**Postal Service, Defendant-Appellee.**

**No. 83–2197.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 13, 1984.

Decided Aug. 9, 1985.

As Amended Aug. 27, 1985.

Amy J. Gittler, Phoenix, Ariz., for plaintiff-appellant.

Mary Elcano, Washington, D.C., for defendant-appellee.

Before TANG and PREGERSON, Circuit Judges, and RAFEEDIE *, District Judge.

TANG, Circuit Judge:

Bonnie Mantolete brought this action under the Rehabilitation Act of 1973, 29 U.S. C.A. § 791, alleging that the United States Postal Service improperly denied her a position based on her physical handicap. The district court entered judgment for the defendant. Plaintiff makes four assertions on appeal: *first*, the court erroneously admitted evidence regarding her medical condition which the Post Office did not possess at the time it refused to hire her for the job; *second*, the court erroneously dismissed plaintiff's class action allegations and refused to allow pertinent discovery; *third*, the court applied an incorrect legal standard in determining plaintiff was not an otherwise qualified handicapped person; and *fourth*, the court failed to apply a meaningful standard for determining a rea-

---

* Honorable Edward Rafeedie, United States District Judge for the Central District of California, sitting by designation.

sonable accommodation could not be made by the Post Office. We affirm the district court on the first two grounds and reverse and remand on the others.

## I.

On July 23, 1976, Bonnie Mantolete applied for a job as a machine distribution clerk at the United States Postal Service in Phoenix, Arizona. As a machine distribution clerk, she would have been employed as a Multi Purpose Letter Sorter Machine ("LSM") operator. Mantolete passed a written exam and was placed on a list of people to be considered for the position. She was an epileptic at the time she applied for the position.

Mantolete was referred to the Occupational Medical Clinic for a standard pre-employment physical. Dr. Jose C. Pallares gave her a complete physical, took a medical history, and recommended to the Post Office that she not be placed in a position which would involve driving a vehicle or using dangerous tools or machinery with moving parts. He noted on the Post Office's form that she averaged one grand mal seizure per year, was taking medication, and that her epilepsy was adequately controlled.

Dr. Pallares sent to the Post Office: plaintiff's medical history record, her physical fitness inquiry, a certificate of medical examination, an x-ray report, and a medical report. On the basis of this information, Dr. Mason, the Post Office Medical Officer, recommended to the Phoenix Post Office that Mantolete not be considered further for the LSM position. Mantolete appealed this recommendation unsuccessfully to Dr. Nixon, the Regional Medical Officer. Neither Dr. Mason nor Dr. Nixon requested any additional medical information nor any information regarding plaintiff's prior employment history. Based upon these recommendations, the Post Office denied further consideration of Mantolete's application.

### The Letter Sorter Machine

The LSM is a large letter sorting machine on which a crew of 17 machine distribution clerks works. The front of the machine has 12 operator consoles which are 7 feet long by 33 inches wide. There are various mail racks and trucks in the adjacent area. The back has 277 mail bins into which letters are automatically sorted and again, various mail racks and trucks are adjacent to it. Both parties agree that the LSM is safe for all employees.

The LSM job entails three distinct functions which an operator normally performs for the coding and distribution of mail. They are called "ledge loading," "keying" and "sweeper-tying". First, in loading the mail, the "ledge loading operation," the machine distribution clerk picks up large trays of mail and places these trays on one of the ledges in the front of the machine. The "ledge loader" is responsible for placing the mail on the ledge so that it can be slowly carried to the automatic "pick-off arm," an arm that is constantly picking off by a vacuum process a one to three-ounce letter and placing it in front of a seated operator for distribution.

Next, in "keying" mail, an operator sits in front of a keyboard and watches as the vacuum arm places a letter on the keyboard for the punching of a distribution code, based on the address, which the operator has committed to memory. Once the code is punched by the operator, the letter is carried along by a drive chain mechanism. Letters move in and out of the operator's field of vision at the rate approximately of one letter per second. The mail supply to the vacuum pick-off arm is controlled by a photoelectric cell. The automatic pick-off arm is approximately two-feet from the seated console operator, and the recessed chains are exposed through a narrow slot. The size of the arm is approximately 8–12 inches long and ¾ inches in diameter. The arm is well-rounded, with no sharp corners.

The final job duty performed by a machine distribution clerk is called "sweeper-tying." An operator pulls mail which has been sorted by the console operator and carried to the back of the machine. The

operator retrieves the mail from the slots. A person who cannot reach the top bins climbs on a stool to reach mail in those bins.

Another duty of the sweep-tyer is to disengage letters jammed in the machine. The area in which the sweeper-tyer removes jammed letters is called the "dropper jam" area and is located just above letter carts that carry mail throughout the machine. In order to unjam a letter, an employee must first turn a switch which halts the movement of a dropper arm, but not the letter carts, and then opens a plexiglass door marked "caution" in order to reach into the jammed area.

*Previous Employment*

From 1971 through the trial below, Ms. Mantolete was successfully employed in various capacities at Motorola. Specifically she worked in the epitaxial, thryster, piece parts and metal small signal assembly departments. Her work in those departments involved the operation of a number of sophisticated machines including a vapor washer, a high speed box spinner, a wafer scrubber, a high pressure water blasting cleaning machine, a stamping machine, a dyeing machine and a rotary welder. Other responsibilities required Ms. Mantolete to pour at shoulder-level five gallon jugs of lye and acids into degreasing machines, to load and withdraw items from hot furnaces, and to operate an envelope stuffer machine which rhythmically carried and stuffed checks into envelopes. Finally, Ms. Mantolete also worked in the Motorola cafeteria where there were steam tables, a meat slicing machine and a high coffee urn that employees had to fill by standing on a stool or ladder.

Ms. Mantolete was accustomed to working a twelve-hour night shift and was described by her supervisor as a "very good employee," "very productive", "always willing to learn new jobs", a "self-starter" with an above average attendance record. On the night shift she was "alert" and "wide awake" and worked without difficulty.

Mr. Robert Roehl, plaintiff's rehabilitation engineer, testified at trial that the work Ms. Mantolete performed, and the machinery she worked on at Motorola, exposed her to moving parts that were slightly more dangerous than the postal service machine but were not unsafe. The Postal Service did not contradict this testimony.

*Plaintiff's Medical Condition*

Epilepsy is defined as a paroxysmal disorder of the nervous system which may be associated with, or accompanied by, impairment of the individual's consciousness or awareness and may also be accompanied by convulsive or more complex movements of the body.

The extent of Ms. Mantolete's condition is somewhat in dispute. She has what are commonly referred to as "grand mal" or generalized seizures, involving the whole body or whole brain, loss of consciousness, convulsive movements and in some cases, "tonic" movements or, a stiffening of the extremities and "clonic" movements or a "jerking" of the extremities.

Since contracting the disorder in 1967, Ms. Mantolete has averaged one grand mal seizure per year during the day, although, between 1978 and 1981 she had no daytime generalized seizures at all. She also has nocturnal seizures, seizures which occur while she is asleep.

There are three principal areas of contested facts regarding Ms. Mantolete's medical condition. First, the Postal Service contends that she has partial seizures with complex symptoms. In Ms. Mantolete's case, these are believed to include a loss of awareness of her surroundings and a distortion in her perception of passage of time. Ms. Mantolete describes these occurrences as periods of "daydreaming" and denies they are seizures of any kind. There is apparently no dispute that these periods occur once every two or three weeks and last only a few moments.

Second, the Postal Service argues that Ms. Mantolete is sensitive to photic stimulation, that is, a propensity in certain epileptics to be sensitive to flashing lights so as to cause seizures. Ms. Mantolete ac-

knowledges that in 1967, when she first contracted epilepsy, she was tested under laboratory conditions and shown to be photically sensitive. She was tested again several times in subsequent years and never again displayed any sensitivity. Further, she has never been photically stimulated in the environment, outside the laboratory. Her initial sensitivity occurred at the relatively high frequency of 15 times per second, that is, the light which triggered her seizure flashed at a rate of 15 times per second. The areas of potential concern for Ms. Mantolete at the Post Office produce flashes at a rate approximately of once per second. The frequency difference, she argues, renders the prior laboratory sensitivity insignificant.

As adduced at trial, most people diagnosed as epileptic require some time initially to adjust to medication for their particular disorder. After this period, the number and severity of seizures is decreased. During the twelve years prior to this trial that Ms. Mantolete worked at Motorola, she had three seizures at work. She has never been injured as a result of any seizure in her lifetime. Defendant's witness, Dr. Alan Yudell, who was formerly Ms. Mantolete's treating physician, testified that her potential for having a seizure at work was extremely small and the subsequent chance of her being injured as a result of such a seizure was even more remote. He stated further that her medical condition was in complete control.

Finally, defendants argue and the trial court concluded as a matter of law that accommodations would not have been reasonable in this case because they would have required the expenditure of large amounts of money and would not make the machine safe for Ms. Mantolete.

Mr. Roehl, plaintiff's expert rehabilitation engineer, testified that, if any such accommodations were deemed necessary, they would be simple and inexpensive. He suggested a plexiglass guard for the key operator position and a $30.00 pair of tongs to assist in clearing the dropper jams.

These tongs have already been produced and are in use at numerous Post Offices.

*The Trial*

This case was originally filed on April 10, 1978, as a national class action on behalf of all epileptics. Plaintiffs sought to prohibit unlawful discrimination by the Postal Service under Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 (1976 and Supp. V 1981) and the fifth amendment of the Constitution. The district court, in response to defendant's motion for a protective order, limited the discovery with respect to the class allegations to "epileptics only applying for employment with the United States Postal Service within the State of Arizona." The judge subsequently denied Ms. Mantolete's motion to expand discovery and granted the Postal Service's motion to dismiss all claims for relief other than the statutory claim under the Rehabilitation Act and to strike the class allegations.

Before trial, Ms. Mantolete filed a motion in limine to exclude from the Postal Service's defense any evidence about her medical or work history that it did not have when it denied her employment. This motion was denied and defendants were allowed to present such evidence for the limited purpose of rebuttal of Ms. Mantolete's prima facie case of qualification.

After a trial to the bench, the district court entered Findings of Fact, Conclusions of Law, and Judgment in favor of the Postal Service on May 4, 1983. The court found that Ms. Mantolete suffered from grand mal and partial complex seizures, that she was sensitive to photic stimulation and that the envelopes and flashing lights created such an effect. The court found that she could be seriously injured if she had such a seizure while performing any of the tasks of LSM operator.

For these reasons, she was found not to be a qualified handicapped person under Section 501 of the Rehabilitation Act of 1973. Therefore, the Post Office did not violate the Act in refusing to hire her and had no obligation to make reasonable accommodations to her handicap because she

could not safely perform the essential functions of the job under any condition and because such accommodation would impose an undue hardship on the Postal Service. This appeal was timely filed.

## II.

This case involves the construction and interpretation of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 (1976 and Supp. V 1981), and appurtenant regulations.

Most of the cases in the area of handicap discrimination involve the interpretation of section 504 of the Act, 29 U.S.C. § 794 (Supp. V. 1984), which prohibits the exclusion, "solely by reason of their handicap" of "otherwise qualified individuals" from government agencies or programs receiving federal funds.[1]

The regulations implementing section 501 give the following general policy:

> Agencies shall give full consideration to the hiring, placement, and advancement of qualified mentally and physically handicapped persons. The Federal Government shall become a model employer of handicapped individuals. An agency shall not discriminate against a qualified physically or mentally handicapped person.

29 C.F.R. § 1613.703. These regulations define "qualified handicapped person" as:

> with respect to employment, a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others and who ... meets the criteria experience and/or education requirements ... of the position in question.

*Id.* at § 1613.702(f).

No court has yet defined "qualified handicapped person" under Section 501. Although this case does not arise under § 504, there is no reason that the § 501 definition should differ from that of § 504, except that § 501 and its regulations impose an explicit requirement that accommodation of the handicap be considered in determining a handicapped person's qualifications for federal employment.

This court has not previously considered the issue raised in this case with respect to the proper standard to be applied in determining whether a person is lawfully denied employment because her handicap could pose some risk to her safety and that of her co-workers. The district court held "an employer is justified in not employing a handicapped person if he or she presents 'an elevated risk' of injury." The court cited this court's opinion in *Bentivegna v. U.S. Department of Labor,* 694 F.2d 619 (9th Cir.1982), in support of this "elevated risk" standard.

*Bentivegna, supra,* is a § 504 case involving the Secretary of Labor's denial of backpay to plaintiff who was a diabetic who was terminated from employment with the city because of evidence that his blood sugar level was not in control, in violation of a city requirement to that effect. This court reversed the Secretary's denial of backpay and held that the requirement discriminated against handicapped individuals because "[n]either the City's allegation of increased risks of injury nor the possibility of long-term health problems is supported by evidence adequate to establish the direct connection between the particular job qualifications applied and the considerations of business necessity and safe performance that the Act requires." *Id.* at 623. The court warned "[a]ny qualification based on the risk of future injury must be examined with special care if the Rehabilitation Act is not to be circumvented easily, since almost all handicapped persons are at greater risk

---

1. *29 U.S.C. § 794 provides in pertinent part:* No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

from work-related injuries ... [A]llowing remote concerns to legitimize discrimination against the handicapped would vitiate the effectiveness of section 504 of the act." *Id.* at 622, 623.

The district court's "elevated risk" language comes from footnote 3 of *Bentivegna* and refers not to a risk elevated by a handicap but to a "job that carries elevated risks of injury." The *Bentivegna* footnote merely clarifies that the court did not hold that a non-imminent risk of injury could never justify rejecting a handicapped individual. "A requirement more directly tied to [a *marked* increase in the risk of injury] might present a different case if applied to applicants for a job that carries elevated risks of injury." *Id.* at 623 n. 3. This court's opinion in *Bentivegna* cannot fairly be interpreted as holding that an elevated risk of injury, without more, is sufficient to justify the refusal to hire an otherwise qualified handicapped person. While the level of safety risk required was not specified in *Bentivegna*, the court cautioned against confusing business necessity (29 C.F.R. § 32.14 (1982)) with "mere expediency". *Id.* at 622.

The district court further relies on *E.E. Black Ltd. v. Marshall*, 497 F.Supp. 1088 (D.Haw.1980), to support an elevated risk standard. E.E. Black was an employer who denied employment to Mr. Crosby, an apprentice carpenter, because a former back injury made him a poor risk against injury. The Assistant Secretary of Labor held that, while the requirement of a healthy back for the position of apprentice carpenter constituted a valid job requirement, the employer had not met its burden of establishing that Mr. Crosby's back condition affected his "current capacity to perform the work." *Id.* at 1104.

The district court in *Black* restricted the Assistant Secretary's language:

"The decision of the Assistant Secretary can be read as holding that risk of future injury because of a physical or mental condition can never be the basis for rejecting a qualified handicapped individual, irrespective of *the likelihood of injury, the seriousness of the possible injury or the imminence of the injury.* Such a holding is clearly contrary to law. If, for example, it was determined that if a particular person were given a particular job, he would have a 90% chance of suffering a heart attack within one month, that clearly would be a valid rea-

son for denying that individual the job, notwithstanding his status as a qualified handicapped individual. The Court has no doubt that in some cases a job requirement that screens out qualified handicapped individuals on the basis of possible future injury, could be both consistent with business necessity and the safe performance of the job. However, at this stage in the case the Court is not prepared to formulate a legal standard." *Id.* at 1104 (emphasis added).

■ We agree with the court in *Black* and with the court below to the extent it holds that, in some cases, a job requirement that screens out qualified handicapped individuals on the basis of possible future injury is necessary. However, we hold that in order to exclude such individuals, there must be a showing of a reasonable probability of substantial harm. Such a determination cannot be based merely on an employer's subjective evaluation or, except in cases of a most apparent nature, merely on medical reports. The question is whether, in light of the individual's work history and medical history, employment of that individual would pose a reasonable probability of substantial harm.

Such an evaluation necessarily requires the gathering of substantial information by the employer. This, we believe, was Congress' intent in enacting the Rehabilitation Act of 1973; that is, to prevent employers from refusing to give much needed opportunities to handicapped individuals on the basis of misinformed stereotypes.

"Individuals with handicaps are all too often excluded from school and educational programs, barred from employment or are under-employed because of archaic attitudes and laws ..." S.Rep. 93–1297, 93d Cong., 2d Sess. 32, *reprinted in* (1974) U.S.Code Cong. and Ad.News 6373, 6400. In addressing federal employers and contractors, Congress chose to use the term "affirmative action" and to require employers to make "reasonable accommodation" wherever possible; it was clearly implying that a more active and extensive effort than "non-discrimination" must be made to eliminate barriers to employment of the handicapped in federal agencies, departments, instrumentalities and contractors. A mere "elevated risk" standard is not sufficient to insure handicapped people's "right to employment which complements their abilities." S.Rep. No. 48, 93d Cong., 1st Sess. 16 (1974).

In applying this standard, an employer must gather all relevant information regarding the applicant's work history and medical history, and independently assess both the probability and severity of potential injury. This involves, of course, a case-by-case analysis of the applicant and the particular job.

Under § 501, two questions must be asked. *First,* is the applicant presently qualified to perform the essential requirements of the job without a reasonable probability of substantial injury to the applicant or others? If the answer to this question is affirmative, then employment cannot be denied based upon the handicap. If the answer is negative, then a *second* question must be asked; can reasonable accommodation be made, without undue hardship to the employer, sufficient to enable the applicant to perform the essential requirements of the job without a reasonable probability of substantial injury to the applicant or others?

If the reasonable accommodation prong of the analysis is reached, the regulations themselves provide the guidelines for determining what constitutes "reasonable accommodation." "An agency shall make reasonable accommodation ... unless [it] would impose an undue hardship on the operation of its program". (704(a)). "Reasonable accommodation may include, but shall not be limited to ... (2) *job restructuring,* part-time or modified work schedules, *acquisition or modification of equipment or devices* ..." (emphasis added). (704(b)). Finally, 29 C.F.R. § 704(c) provides that in determining whether an accommodation would impose an undue hardship, "factors to be considered include: (1) the overall size of the agency's program with respect to the number of employees, number and type of facilities and size of the budget; (2) the type of agency operation, including the composition and structure of the agency's work force; and (3) the nature and the cost of the accommodation."

Thus an employer has a duty under the Act to gather sufficient information from the applicant and from qualified experts as needed to determine what accommodations are *necessary* to enable the applicant to perform the job safely. The application of this standard requires a strong factual foundation in order to establish that an applicant's handicap precludes safe employment. After marshaling the facts, the employer must make a decision as to the reasonableness of accommodation, in light of the factors enunciated in 29 C.F.R. § 1613.704(c). If the requisite accommodations are not reasonable or if no accommodation can be made to protect against a reasonable probability of substantial injury, then an employer will, of course, not violate § 501 in refusing employment to the applicant. However, although it is the employer who must make a substantial gathering of necessary facts, the determination of whether the employer violated § 501 is to be made by the trial court *de novo.* Therefore, a good faith or rational belief on behalf of the employer will not be a sufficient defense to an act of discrimination. "To approach [the Act] in such a manner, that is by applying the rational basis test, would be to reduce that statute to nothingness, which should always be avoided." *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372 (10th Cir. 1981).

In *Prewitt v. United States Postal Service,* 662 F.2d 292 (5th Cir.1981), plaintiff sued the Postal Service for discrimination under § 501 of the Rehabilitation Act of 1973 for denying him employment as a clerk/carrier due to a shoulder injury he incurred in Vietnam. The district court granted summary judgment for the Postal Service and the court of appeals reversed, holding that a genuine issue of material fact existed. The court held that, while the plaintiff bears the burden in the first instance of showing she is qualified to perform the essential functions of the job,

"the burden of proving inability to accommodate is on the employer. The administrative reasons for so placing the burden likewise justify a similar burden of proof in a private action based on the Rehabilitation Act. The employer has greater knowledge of the essentials of the job than does the handicapped applicant. The employer can look to its own experience, or, if that is not helpful, to that of other employers who have provided jobs to individuals with handicaps similar to those of the applicant in question. Furthermore, the employer may be able to obtain advice concerning possible accommodations from private and government sources. *See* Note, *Accommodating the Handicapped: Rehabilitating Section 504 after Southeastern,* 80 Colum.L.Rev. 171, 187–88 (1980)." *Id.* at 308.

While the burden of persuasion in proving inability to accommodate always remains on the employer, once the employer presents credible evidence that accommodation would not reasonably be possible, the plaintiff has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence. *Prewitt,* 662 F.2d at 308.

■ The trial court below held that Mantolete was not a qualified handicapped person because her employment as a letter sorting machine operator would pose "an elevated risk of injury." As outlined above, however, a more demanding legal standard is required if the policies expressed in the Act's legislative history and regulations are to be implemented in a meaningful way. Although we can appreciate the federal employer's concern for the safe and efficient operation of a particular workplace, an "elevated risk" standard does little to recognize the appropriate factors affecting the ability of an individual who seeks to work in an environment which the government itself has opened to those with physical or mental handicaps. We therefore remand this case to the district court for a determination of whether, in light of Mantolete's work history and medical history, employment of her would pose a reasonable probability of substantial harm. If it is determined that some accommodation is necessary, the district court should evaluate the reasonableness of the proffered accommodation in light of the variables and proof burdens articulated in this opinion.

### III.

The appellant argues that the district court abused its discretion by refusing to exclude evidence of the appellant's condition obtained after the Postal Service had decided against hiring the appellant as a machine distribution clerk. The district court's ruling on the admissibility of evidence will only be overturned if it constitutes a clear abuse of discretion. *Reid Bros. Logging Co. v. Ketchikan Pulp Co.,* 699 F.2d 1292, 1307 (9th Cir.1983).

■ Mantolete sought to exclude evidence of her condition which the Postal Service obtained after its hiring decision in 1976. Mantolete attempted to exclude this evidence in the form of a motion in limine which the district court denied. *Mantolete v. Bolger,* 96 F.R.D. 179, 183 (D.Az.1982).

Although it is questionable whether the Postal Service could justify its refusal to hire Mantolete based on evidence obtained after its decision to reject her application, *Nanty v. Barrows Co.,* 660 F.2d 1327, 1332 (9th Cir.1981), the admissibility of post-decision evidence is not necessarily forbidden for all purposes. Here, the district court determined that such evidence would be relevant as part of the defendant's efforts to rebut Mantolete's prima facie case of discrimination. The district court did not rely on post-decision evidence to conclude that the Postal Service was reasonable in its rejection of Mantolete's application. The evidence of the appellant's actual medical condition was therefore limited to the defendant's claim that Mantolete suffered from a condition that prevented her from performing the essential functions of the job. The evidence was not admitted as an after-the-fact effort to demonstrate a nondiscriminatory motive. Thus, the evidence was admissible to rebut the appellant's claim that she was qualified for the position, but was not admissible to enlarge the basis upon which the employer relied to reject the appellant at the time that decision was made. Consequently, if the evidence is admitted to rebut the prima facie showing of qualification for the position, and such evidence is determined by the trier of fact to be insufficient to rebut this aspect of the plaintiff's prima facie case, the evidence cannot further be used to justify the plaintiff's rejection. The asserted basis for the employer's decision not to hire the plaintiff is limited to the evidence relied on by the employer at the time the decision was made. We conclude that the trial court did not abuse its discretion by denying the appellant's motion in limine.

■ Mantolete also claims that the trial court abused its discretion by refusing to allow discovery for an asserted national class. Although in some cases a district court should allow discovery to aid the determination of whether a class action is maintainable, the plaintiff bears the burden of advancing a prima facie showing that the class action requirements of Fed.R. Civ.P. 23 are satisfied or that discovery is likely to produce substantiation of the class allegations. Absent such a showing, a trial court's refusal to allow class discovery is not an abuse of discretion. *Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304, 1313 (9th Cir.1977).

■ Here, the district court did not abuse its discretion. The appellant offered

two other complaints filed elsewhere by epileptics against the Postal Service. Such a showing, however, does not furnish a compelling basis on which to conclude that the district court's refusal to grant expanded discovery for national class action treatment was an abuse of discretion. Nor does such a showing provide a likelihood that discovery measures will "produce persuasive information substantiating the class action allegations." *Doninger,* 564 F.2d at 1313. In addition, determining the propriety of relief in cases of this nature underscores the importance of case-by-case adjudication. Whether a particular individual is a "qualified handicapped individual" under the law will necessitate an inquiry into the individual's medical and work history as well as an inquiry into other factors bearing on the person's fitness for a given position. The district court did not err by denying expanded discovery or dismissing the class action allegations.

### IV.

### CONCLUSION

The district court did not abuse its discretion by refusing to exclude evidence of the appellant's condition obtained after the Postal Service's decision to reject her application to serve as a machine distribution clerk. It was not an abuse of discretion to deny expanded national class discovery or an error to dismiss the class allegations. We remand, however, for a determination of whether the appellant is a qualified handicapped individual under the standards articulated above, and, if necessary, for a determination of whether reasonable accommodation can be made to enable the appellant to engage in the occupation she seeks.

AFFIRMED in part, REVERSED in part, and REMANDED.

1. Without elaboration, the Court apparently has recognized that risk to self is a valid consideration under the Rehabilitation Act. *See* Opinion at 1423. Allowing consideration of risk to self is to be contrasted with cases under Title VII in which risk to the plaintiff is not sufficient to establish either a bona fide occupational qualification or the business necessity defense. *See Dothard v. Rawlinson,* 433 U.S. 321, 335 (1972). This recognition, however, is consistent with the implication of this Circuit's prior decision in *Bentivegna,* 694 F.2d at 622 n. 2, and the definition of "qualified handicapped person" in 29 C.F.R. § 1613.702(f).

2. Other subsections of § 501 establish an interagency committee to assist the Office of Person-

RAFEEDIE, District Judge, concurring:

I concur. I write, however, to stress that this case decides issues solely under § 501 and not § 504.

Today's decision not only lays down a standard for consideration of risk of future injury,[1] it also imposes demanding information-gathering requirements upon federal employers. Such burdens are justified in light of the express language of § 501 and its implementing regulations. However, whether these requirements are applicable to private employers under § 504 is a question left open by this case.

Section 501(b) provides that: "Each department, agency, and instrumentality ... in the executive branch shall ... submit ... an affirmative action program plan for the hiring, placement, and the advancement of handicapped individuals...." The plan must provide methods for meeting the special needs of handicapped employees, and it must be updated and reviewed annually.[2] *Id.* Further, 29 C.F.R. § 1613.703 states that: "The Federal Government shall become a model employer of handicapped individuals ..." Given these pronouncements, I agree that a federal employer must gather "all relevant information" before making an employment decision.[3] *See* Opinion at 1423.

Section 504, however, contains no such express statements. Because of this omission, the question of whether Congress intended to impose similarly stringent requirements on private employers should be left for another case. Certainly it is hoped that private employers will follow the government's lead, but it is debatable whether Congress meant to impose equivalent obligations. Noting this unresolved issue, I concur.

nel Management in facilitating employment of the handicapped and require annual submission of a report to appropriate congressional committees concerning the effectiveness of affirmative action programs.

3. Although I concur, I do question the desirability of requiring federal employers to consider the applicant's work history as well as his/her medical history. Requiring consideration of work history carries with it the danger of bringing subjectivity into the hiring calculus. *See Nanty v. Barrows,* 660 F.2d 1327, 1334 (9th Cir. 1981) ("subjective job criteria present potential for serious abuse and should be reviewed with much skepticism").