Dorothy J. WALLACE, Plaintiff,

v.

VETERANS ADMINISTRATION; Veterans Administration Medical Center, Wichita, Kansas; Robert F. Pelka, Individually and as Director of the Veterans Administration Medical Center, Wichita, Kansas; Rozelle Knight, Individually and as Chief of Nursing Service at the Veterans Administration Medical Center, Wichita, Kansas; and Gregory McCullough, Individually and as Personnel Management Specialist for the Veterans Administration Medical Center, Wichita, Kansas, Defendants.

No. 86–1617–K.

United States District Court, D. Kansas.

April 14, 1988.

Shannon S. Krysl, Wichita, Kan., for plaintiff.

Benjamin L. Burgess, Jr., U.S. Atty. and Stephen K. Lester, Asst. U.S. Atty., Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This matter is before the court on plaintiff's motion for summary judgment. In this action, plaintiff Dorothy Wallace, a recovering drug addict, contends that the Veterans Administration's ("V.A.") refusal to hire her as a nurse in the Intensive Care Unit ("ICU") of the V.A. Hospital was in violation of §§ 501, 504 and 505 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794, 794a(a)(1), which prohibit discrimination against handicapped individuals.

Plaintiff applied for a position with the V.A. as a registered nurse in the ICU in July of 1984. The plaintiff was not hired for the position. On September 25, 1984, she filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of her physical handicap. Following investigation of the complaint by the V.A. and a proposed disposition finding no discrimination, plaintiff requested a hearing by the EEOC complaints examiner. A full evidentiary hearing was held on August 21–22, 1986. On March 31, 1987, the complaints examiner issued her proposed decision finding discrimination and recommending that plaintiff be hired by the V.A. as an RN, awarded back pay, benefits, and reasonable attorney fees. On May 12, 1987, the V.A. Office of General Counsel rejected the complaints examiner's recommended decision, finding it was not substantiated by the evidence. The V.A.'s rejection of the decision was the final action of the agency.

Plaintiff filed her complaint with this court on July 16, 1986, but asked the court to stay the proceedings pending the outcome of the administrative process. *See* 29 C.F.R. § 1613.281 (statutory right to file civil action). Following plaintiff's exhaustion of the administrative process,[1] the stay was lifted and plaintiff filed this motion for summary judgment. It is agreed by the parties that the court's review of the evidence is conducted *de novo*.

Having carefully read and reviewed the entire 997–page transcript of the EEOC hearing, and having heard full arguments on the motion for summary judgment, the court is now prepared to rule. For the reasons set forth herein, the court finds the V.A. discriminated against the plaintiff on the basis of her handicap in violation of the Rehabilitation Act. Therefore, the plaintiff's motion for summary judgment will be granted.

The facts in this case are undisputed. In July of 1984, Dorothy Wallace answered a newspaper advertisement and applied for a position as an RN in the Wichita, Kansas V.A. Hospital's Intensive Care Unit. At that time, Ms. Wallace was a fully trained and licensed registered nurse with extensive experience in intensive care units. The plaintiff had been employed in a variety of RN positions in various hospitals in Missouri, Kansas and Arkansas. There is no doubt that plaintiff was well qualified for a position in the ICU of the V.A. Hospital.

However, plaintiff was also an admitted recovering drug abuser. The plaintiff's testimony, as contained in the transcript of the EEOC hearing, is a fascinating personal account of the disease of drug addiction and its hellish consequences. It also offers insight into the determination, and human understanding, necessary to effect a successful recovery. The details need not be recounted here, however, as it is undisputed that at the time of plaintiff's application with the V.A. she had been free of drug abuse for over nine months, having entered a drug abuse rehabilitation program in August of 1983. Ms. Wallace was certified as free from drug abuse by both her treating physician and the rehabilitation center which she had attended. Plaintiff's treating physician submitted a letter of recommendation on her behalf to prospective employers. He recommended that she be restricted in access to controlled substances (i.e., injectable narcotics) for a 12–18 month

---

[1] Before filing a § 501 action, plaintiff must exhaust administrative remedies. *See Gardner v. Morris*, 752 F.2d 1271, 1278–79 (8th Cir.1985). *See also* 29 U.S.C. § 794a(a)(1).

period and that she be given random urine tests.

Along with attending daily AA or NA meetings, Dorothy Wallace voluntarily joined the Kansas State Nursing Association Impaired Nurse Peer Assistance Program in May, 1984. She signed a contract with Peer Assistance in which she promised to inform prospective employers of her impairment, and to be restricted for a period of time from administering narcotics.

Dorothy Wallace submitted her application to the V.A. on July 12, 1984. Although she requested any RN position, her first choice was in ICU, as per the want ad. She was interviewed the same day she applied. During her interview, Ms. Wallace disclosed she was a recovering drug addict. The interviewer, Nancy Barton, was favorably impressed with Ms. Wallace's background and experience and recommended that she be hired with certain restrictions.

However, Dorothy Wallace was not hired. The reason she was given was that due to her narcotic administration restriction, she could not perform the full range of duties as an RN in ICU. Moreover, she was informed that she could not be considered for any RN position at the V.A., but could be considered for a clerical position paying minimum wages.[2] As a result of the V.A.'s refusal to hire her due to her narcotic restriction, Ms. Wallace filed her complaint alleging discrimination.

Because the facts are not in controversy, summary judgment is appropriate. The court must determine whether the law affords plaintiff a remedy given the facts at hand.

In determining whether defendant's actions herein were in violation of the Rehabilitation Act, the court is mindful of the social purpose behind the legislation. Congress passed the Rehabilitation Act of 1973 in order to "promote and expand employment opportunities in the public and private sectors for handicapped individuals." 29 U.S.C. § 701(8). The Act is a sweeping attempt to combat all forms of discrimination against the handicapped. It not only

created wide-ranging, federally-funded programs to enable handicapped persons to reach their full potential as active members of society, it established that the federal government, federal contractors and recipients of federal funds cannot discriminate against the handicapped. In passing this legislation, Congress sought to make this form of discrimination as reprehensible as discrimination based on sex, race, or ethnic background. *See* S. Rep. 890, 95th Cong., 2d Sess. 18–19 (1978), U.S.Code Cong. & Admin.News 1978, 7312, 7329–30.

The duties of the three classes of entities listed above are set forth in separate sections of the Act. Section 503, 29 U.S.C. § 793, requires *federal contractors* to "take affirmative action to employ and advance in employment qualified handicapped individuals...."

Section 504 of the Act, 29 U.S.C. § 794, as amended, prohibits the exclusion "solely by reason of their handicap" of "otherwise qualified individuals" from government agencies or *recipients of federal funds.*

The duties of the federal government itself are set forth in § 501(b), 29 U.S.C. § 791(b), as follows:

Each department, agency, and instrumentality ... in the executive branch shall ... submit to the Civil Service Commission ... an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals in such department, agency, or instrumentality. Such plan shall include a description of the extent to which and methods whereby the special needs of handicapped employees are being met.

Thus, the Act recognizes that "the Federal Government must be an equal opportunity employer, and that this equal opportunity must apply to handicapped individuals." S. Rep. No. 318, 93rd Cong., 1st Sess. 49 (1973), U.S.Code Cong. & Admin.News 1973, pp. 2076, 2122. Unlike § 504 of the Rehabilitation Act which, like Title VII, requires only nondiscrimination, § 501 requires affirmative action on the part of federal agencies. The legislative history of

---

**2.** The position in ICU paid over $21,000/year.

§ 501 illustrates that the federal government is to act as the "model employer" of the handicapped and " 'take affirmative action to hire and promote the disabled.' " *Prewitt v. United States Postal Service,* 662 F.2d 292, 302 (5th Cir.1981) (quoting *Rehabilitation of the Handicapped Program 1976: Hearings Before the Subcommittee on the Handicapped of the Committee on Labor and Public Welfare,* 94th Cong., 2d Sess. at 1502 (1976)). *See also* 29 C.F.R. § 1613.703. In other words, § 501 requires that federal agencies do *more* than just submit affirmative action plans, they also must "structure their procedures and programs so as to ensure that handicapped individuals are afforded equal opportunity in both job assignment and promotion." *Ryan v. Federal Deposit Insurance Corp.,* 565 F.2d 762, 763 (D.C.Cir. 1977).

In its 1978 amendments to the Rehabilitation Act, Congress created a private cause of action allowing individuals to obtain relief for handicap discrimination on the part of the federal government and its agencies. The new § 505 to the Act provides that "[t]he remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 ... shall be available with respect to any complaint under section [501]." 29 U.S.C. § 794a(a)(1).

In this case, plaintiff asserts claims pursuant to both § 504 and § 501.

■■■ Section 504 provides coverage for any "otherwise qualified handicapped individual." The definition of this term must be broken down into its two elements: (1) "handicapped individual"; and (2) "otherwise qualified". 29 U.S.C. § 706(8)[B] (Supp.1987) defines a "handicapped individual" as:

[A]ny person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment....

Alcoholism and drug addiction are included in this definition. *Tinch v. Walters,* 765 F.2d 599 (6th Cir.1985); *Whitlock v. Donovan,* 598 F.Supp. 126 (D.D.C.1984), *aff'd,* 790 F.2d 964 (1986); *Davis v. Bucher,* 451 F.Supp. 791 (E.D.Pa.1978). Accordingly, Dorothy Wallace is a "handicapped individual" as defined in the statute.

The seminal case interpreting the term "otherwise qualified" is *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). *Davis* involved a plaintiff with a serious hearing disability who sought admission into defendant Southeastern's nursing program. The defendant refused her admission after it determined that her handicap made it unsafe for her to practice as a nurse. She could not understand speech except by lip reading, and, as such, defendant determined that it would be impossible for plaintiff to participate safely in the normal program without substantial modifications which would keep her from realizing the benefits of the program. The plaintiff brought suit under § 504 alleging that she was an "otherwise qualified handicapped individual" who was rejected "solely by reason of her handicap."

The Supreme Court held that § 504 was not violated because plaintiff was not "otherwise qualified." The Court stated:

As previously noted, this is the first case in which this court has been called upon to interpret § 504.... Section 504 by its terms does not compel educational institutions to disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to participate. Instead, it requires only that an "otherwise qualified handicapped individual" not be excluded from participation in a federally funded program "solely by reason of his handicap," indicating that mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context.

The court below, however, believed that the "otherwise qualified" persons protected by § 504 include those who would be able to meet the requirements of a particular program in every respect except as to limitations imposed by their handicap. Taken literally, this holding would prevent an institution from taking

into account any limitation resulting from the handicap, however disabling. It assumes, in effect, that a person need not meet legitimate physical requirements in order to be "otherwise qualified." We think the understanding of the District Court is closer to the plain meaning of the statutory language. *An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap.*

442 U.S. at 405–06, 99 S.Ct. at 2366–67 (citation omitted; emphasis added).

Thus, following *Davis,* a plaintiff states a viable cause of action under § 504 only if he is "otherwise" qualified (i.e., qualified "in spite of" his handicap), and, even so, was rejected for the position solely on the basis of his handicap. *See Daubert v. United States Postal Service,* 733 F.2d 1367, 1371 (10th Cir.1984); *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372 (10th Cir.1981). The lower courts have consistently held, however, that in making the qualification determination, both the legitimacy of the physical requirements and the possibility of reasonable accommodation must be considered. *See, e.g., Bentivegna v. United States Department of Labor,* 694 F.2d 619 (9th Cir.1982); *Prewitt v. United States Postal Service,* 662 F.2d 292, 307 n. 21; *Simon v. St. Louis County, Mo.,* 656 F.2d 316 (8th Cir.1981), *cert. denied,* 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982).

In *Simon,* the Eighth Circuit articulated the consideration of the legitimacy of the requirements as follows:

The Supreme Court in *Davis* referred to those handicapped persons who could satisfy all of the "legitimate physical requirements" of the defendant's program. [442 U.S.] at 406, 99 S.Ct. at 2367.... Part III of the *Davis* opinion discussed whether the physical qualifications Southeastern demanded of the applicant were necessary for participation in its nursing programs. It concluded that the ability to understand speech without lip reading was necessary during the clinical phase of the program and indispensable for many functions that a registered nurse performs. The Supreme Court noted that the *only evidence in the record* indicated that nothing less than close, individual attention by a nursing instructor would be sufficient to insure patient safety if respondent took part in the clinical phase of the nursing program. *Id.* at 409, 99 S.Ct. at 2368.

The proper focus ... is therefore whether the requirements set forth by defendants ... are necessary and legitimate requirements of the job.

656 F.2d at 320.

In *Arline School Board of Nassau County,* 772 F.2d 759 (11th Cir.1985), *aff'd,* 480 U.S. ——, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the Eleventh Circuit found that a determination of whether reasonable accommodation can be made is implicit in determining if the handicapped individual is "otherwise qualified":

While legitimate physical qualifications may be essential to the performance of certain jobs, *see [Davis ]* 442 U.S. at 406–07, 99 S.Ct. at 2367, both that determination and the determination of whether accommodation is possible are fact specific issues. The court is obligated to scrutinize the evidence before determining whether the defendant's justifications reflect a well-informed judgment grounded in a careful and open-minded weighing of the risks and alternatives, or whether they are simply conclusory statements that are being used to justify reflexive reactions grounded in ignorance or capitulation to public prejudice. *See, e.g., Strathie v. Department of Transportation,* 716 F.2d 227 (3d Cir.1983); *New York State Association for Retarded Children v. Carey,* 612 F.2d 644 (2d Cir.1979).

772 F.2d at 764–65.

Similarly, in *Bentivegna v. United States Department of Labor,* 694 F.2d 619 (9th Cir.1982), the Ninth Circuit held that the *Davis* holding "cannot mean that the City can discriminate by establishing restrictive program requirements.... The Rehabilitation Act, taken as a whole, mandates significant accommodation for the capabilities and conditions of the handi-

capped." 694 F.2d at 621. *See also Prewitt v. United States Postal Service*, 662 F.2d 292, 307 n. 21 ("This court has consistently held that § 504 mandates reasonable accommodation. . . .").

Thus, the courts have consistently ruled that in a § 504 employment action, the employer has the burden of proving that the physical criteria offered as justification for refusal to hire the plaintiff are reasonable and job-related. Implicit in this burden is a showing that accommodation cannot reasonably be made. These holdings appear to be consistent with *Davis* in that while the Court stated that there is no requirement that an employer make *substantial* modifications in order to accommodate, it left open the possibility that, in certain situations, refusal to accommodate may be unreasonable.

Any doubts as to the Supreme Court's meaning were put to rest in *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), wherein the Court noted:

> In Davis, we stated that § 504 does not impose an "affirmative-action obligation on all recipients of federal funds." 442 US, at 411, 60 L Ed 2d 980, 99 S Ct 2361. Our use of the term "affirmative action" in this context has been severely criticized for failing to appreciate the difference between affirmative action and reasonable accommodation; the former is said to refer to a remedial policy for the victims of past discrimination, while the latter relates to the elimination of existing obstacles against the handicapped. Regardless of the aptness of our choice of words in *Davis*, it is clear from the context of *Davis* that the term "affirmative action" referred to those "changes," adjustments," or "modifications" to existing programs that would be "substantial," 442 US, at 410, 411, n 10, 413, 60 L Ed 2d 980, 99 S Ct 2361, or that would constitute "fundamental alteration[s] in the nature of the program . . . ," *id.*, at 410, 60 L Ed 2d 980, 99 S Ct 2361, rather than to those changes that would be reasonable accommodations.

469 U.S. at 300 n. 20, 105 S.Ct. at 720 n. 20 (citations omitted). *See also School Board of Nassau County Florida v. Arline*, 480 U.S. ——, 107 S.Ct. 1123, 94 L.Ed.2d 307 n. 17 (1987).

Of course, pursuant to § 501, federal agencies have an *explicit* duty to accommodate. *See Mantolete v. Bolger*, 767 F.2d 1416, 1421 (9th Cir.1985) ("Section 501 and its regulations impose an explicit requirement that accommodation of the handicap be considered in determining a handicapped person's qualifications for federal employment.").

■ Because this court finds that both §§ 504 and 501 impose a duty of reasonable accommodation upon the employer, a separate analysis of each claim is not required. *See, e.g., Prewitt v. United States Postal Service*, 662 F.2d 292. Both sections prohibit the federal employer from discriminating against a "qualified handicapped person."

"Qualified handicapped person" is defined in the regulations as:

> [W]ith respect to employment, a handicapped person who, with or without reasonable accommodation can perform the essential functions of the position in question without endangering the health and safety of the individual or others and who . . . meets the criteria experience and/or education requirements . . . of the position in question.

29 C.F.R. § 1613.702(f).

The regulations also offer a basis for determining the extent of the government's accommodation duty:

> (a) An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.
>
> (b) Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appro-

priate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

(c) In determining pursuant to paragraph (a) of this section whether an accommodation would impose an undue hardship on the operation of the agency in question, factors to be considered include: (1) The overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's work force; and (3) the nature and the cost of the accommodation.

29 C.F.R. § 1613.704.

█ In applying the facts of this case to these legal principles, the court must first be cognizant of the allocation of burdens and order of presentation of proof. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The court is inclined to employ the approach adopted by the Fifth Circuit in *Prewitt.* Like the case at bar, *Prewitt* was a suit against a government agency in which the plaintiff asserted claims pursuant to both §§ 501 and 504. Also, the case involved issues of both disparate impact and insurmountable barrier.[3] The court capsuled the elements as follows:

[T]he disabled claimant, may establish a prima facie case of unlawful discrimination by proving that: (a) except for his physical handicap, he is qualified to fill the position; (b) he has a handicap that prevents him from meeting the physical criteria for employment; and (c) the challenged physical standards have a disproportionate impact on persons having the same handicap from which he suffers. To sustain this prima facie case, there should also be a facial showing or at least plausible reasons to believe that the handicap can be accommodated or that the physical criteria are not "job related."

(2) Once the prima facie case of handicap discrimination is established, the burden of persuasion shifts to the federal employer to show that the physical criteria offered as justification for refusal to hire the plaintiff are "job related," i.e., that persons who suffer from the handicap plaintiff suffers and who are, therefore, unable to meet the challenged standards, cannot safely and efficiently perform the essentials of the position in question. If the issue of reasonable accommodation is raised, the agency must then be prepared to make a further showing that accommodation cannot reasonably be made that would enable the handicapped applicant to perform the essentials of the job adequately and safely; in this regard, the [agency] must "demonstrate that the accommodation would impose an undue hardship on the operation of its program," 29 C.F.R. § 1613.704(a), taking into consideration the factors set forth by 704(c) of the cited regulation.

(3) If the employer proves that the challenged requirements are job related, the plaintiff may then show that other selection criteria without a similar discriminatory effect would also serve the employer's legitimate interest in efficient and trustworthy workmanship. *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *Johnson v. Uncle Ben's, Inc.,* 657 F.2d 750, 752 (5th Cir.1981). When the issue of reasonable accommodation is raised, the burden of persuasion in proving inability to accommodate always remains on the

---

3. In *Prewitt,* the court identified four types of discriminatory barriers which handicapped persons may confront when seeking employment: (1) intentional discrimination for reasons of social bias; (2) neutral standards with disparate impact; (3) surmountable impairment barriers; and (4) insurmountable impairment barriers. 662 F.2d at 305 n. 19. The court further found that Title VII jurisprudence is applicable to both intentional social-bias discrimination and disparate impact handicap discrimination. *Id.* See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). However, the "barrier" cases raise issues peculiar to handicap discrimination—i.e., the duty to accommodate. The case at bar involves both "disparate impact" issues and "insurmountable barrier" issues. The elements set forth in *Prewitt* combine the relevant inquiries.

employer; however, once the employer presents credible evidence that reasonable accommodation is not possible or practicable, the plaintiff must bear the burden of coming forward with evidence that suggests that accommodation may in fact be reasonably made.

662 F.2d at 309–10.

Applying these principles to the facts, the court concludes that the plaintiff has established a *prima facie* case. The plaintiff was clearly qualified for the RN staff position in ICU.[4] She had the required education, license and experience to qualify for the position. As her record indicated, she had never been fired or reassigned due to poor job performance. Unequivocally, Dorothy Wallace was qualified to competently perform all job duties of an RN—with the exception of administration of narcotics.

Second, Dorothy Wallace suffers a handicap—drug addiction—which prevents her from meeting a "physical" requirement for employment. In this regard, Ms. Wallace was restricted from administering narcotics to patients, and this was a required duty of an RN in the ICU.

As to the third element, "disproportionate impact" means that the requirement has an adverse impact on recovering drug addicts whose access to narcotics must be restricted. Clearly, the requirement that *all* RNs must be able to administer narcotics precludes those with a restriction from obtaining a position as an RN. Thus, it is clear that the sole reason for the plaintiff's nonselection was the existence of her handicap. *See Pushkin v. Regents of University of Colorado*, 658 F.2d 1372 (10th Cir. 1981).

Finally, Dorothy Wallace presented plausible, factual evidence that the requirement may not be "job related", or could be accommodated. Suzanne Brito, an ICU nurse in the Wichita V.A. Hospital, testified that less than 2% of an ICU nurse's time is spent administering narcotics. She further testified that many patients in the ICU

(e.g., heart patients and liver patients) receive *no* narcotics. Therefore, plaintiff argues that it would be possible to assign her to these patients. The plaintiff also suggests that the job could be restructured so that another nurse on duty could administer narcotics to plaintiff's patient, if necessary, and plaintiff could cover the other nurse's patient. Plaintiff presented the testimony of two experts, Etta Williams and Thomas Edgar, who opined that such modifications are feasible and are successful.

Accordingly, the court finds that plaintiff has established a *prima facie* case of handicap discrimination.

The burden now shifts to the government to prove that the requirement is "job related", or, in other words, an "essential" function of the job. In *Bentivegna v. United States Department of Labor*, 694 F.2d at 622, the court interpreted this requirement, stating that "if job qualification is to be permitted to excluded handicapped individuals, it must be directly connected with, and must substantially promote, 'business necessity and safe performance.'" (Quoting 29 C.F.R. § 32.14.)

Under the facts presented here, the court finds that the requirement that an RN be able to administer narcotics is "job related" only in the sense that it is one of the many "duties" of an RN; less than 2% of an RN's time is spent on this task. The court further finds that the inability to administer narcotics does not prevent an otherwise qualified nurse from being able to perform the essentials of the position if reasonable accommodation is made. In other words, although it is undisputed that some patients must receive narcotic injections in the course of their treatment, it is not essential that each and every nurse be able to administer the drug. As will be discussed, the evidence shows that accommodations such as job sharing or controlled patient assignment could enable the plaintiff to perform the essential functions of an RN adequately and safely.

**4.** Although plaintiff applied for *any* RN position with the V.A., it is agreed that the issue before this court is whether she was qualified for the specific position for which she was nonselected, i.e., as an RN in ICU.

The V.A. contends it was unable to accommodate Dorothy Wallace because it would have been required to hire additional staff, because staff morale would have been affected, and because plaintiff's restriction would have resulted in compromised patient care. However, these assertions are not based on any objective evidence. The V.A. merely speculates. It is clear from the record that the V.A. did not even consider feasible accommodations.

To sustain its burden of proof, the V.A. must present a strong factual foundation in order to establish that the restriction precludes safe employment. *Mantolete v. Bolger,* 767 F.2d 1416, 1423 (9th Cir.1985). It is only after marshaling such facts that the employer can make a decision as to the reasonableness of accommodation. *Id.* Clearly, "a good faith or rational belief on behalf of the employer will not be a sufficient defense to an act of discrimination. 'To approach [the Act] in such a manner, that is by applying the rational basis test, would be to reduce that statute to nothingness, which should always be avoided.'" *Mantolete,* 767 F.2d at 1423 (quoting *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372 (10th Cir.1981)).

In this case, while the court can appreciate the V.A.'s concerns for patient safety, the V.A. has failed to offer any objective proof that such safety would be jeopardized or that accommodating plaintiff would be unreasonable.

On the other hand, the plaintiff put forth an expert—Etta Williams—who works with employers in reintegrating impaired nurses into the work force. She testified that because injection of narcotics is not a major part of a nurse's duties, accommodations for a nurse unable to administer narcotics are easily made. Such "accommodation" might be to have trade-offs or to assign the impaired nurse to a position or patient not requiring the administration of narcotics. She stated that:

> [T]here are very few times when not being able to handle the narcotics would compromise patient care.... I'm not able at this point to think of a time when

the administration of a narcotic would be life or death....

(Tr. of Hrg., p. 353). She further stated that she has never encountered any hardship in situations where she has made similar accommodations.

Etta Williams further testified that recovering nurses make excellent employees, and even with a restriction such as plaintiff's, are well qualified to perform their duties. She also testified that accommodating a restricted nurse, in her experience, causes no morale problems. Finally, she observed that:

> The risks to the employer that hires someone that is recovering are less than they are to the employer that does not. There is continuing evidence that chemical dependency is at least as prevalent in nursing and medicine as it is in the general population and some authorities will say it's considerably higher.

> But employers that do not have a practice of retaining or hiring persons that are recovering then sends the message to their employees that they're not enlightened in this area. And as a result of that, other employees rationalize what they see happening when impaired practice does surface. They accept excuses for why narcotic counts are off. They continue to ignore the realities that are presented.

(Tr., p. 365).

The plaintiff also presented evidence that the V.A. at one time used LPNs in the ICU. LPNs have many restrictions, including IV narcotic administration, supervisory limitations and inability to perform invasive procedures. The defendant presented no evidence that patient care was compromised by the presence of the LPNs. Although LPNs no longer work in ICU, the V.A. does hire graduate student nurses in ICU. Because these nurses are not yet licensed, they have certain restrictions and cannot perform the full range of duties. The other nurses perform the duties which the graduate nurses are unable to perform. The V.A. offered no evidence that this practice compromises patient care.

The agency presented no evidence—beyond hypotheticals and conjecture—that accommodating Dorothy Wallace would compromise patient care. Further, the only evidence the V.A. offered to suggest that hiring Ms. Wallace would create morale problems was the testimony of a nurse who stated she wouldn't "like" working with a restricted nurse. This same nurse testified that drug addiction is not a disease.

On the other hand, the agency's sole expert witness testified that morale was not a problem in the Lincoln V.A. when the nurses were asked to accommodate the restrictions of a diabetic nurse and a blind nurse.

The agency also offered no evidence to support its assertion that additional staff would have to be hired in order to accommodate plaintiff.

After studying the evidence, the court is convinced that the V.A.'s refusal to accommodate is based on "conclusory statements that are being used to justify reflexive reactions grounded in ignorance and capitulation to public prejudice." *Arline v. School Board of Nassau County,* 772 F.2d 759, 765 (11th Cir.1985). In the face of plaintiff's evidence that hiring recovering RNs with restrictions does not compromise patient care or negatively impact staff morale, and that such employees are dedicated, honest and productive, the V.A. merely presented conjecture about the risk to patients and morale problems. In truth, the V.A. rejected Dorothy Wallace because it was unenlightened and uneducated about recovering nurses.

The V.A. failed to sustain its burden of showing that Dorothy Wallace could not have been reasonably accommodated. Pursuant to the Rehabilitation Act, the V.A. had an obligation to make reasonable accommodation. Further, as a federal agency, it had an obligation to set an example. It failed to do so.

The plaintiff, on the other hand, proved that with accommodation she can meet all employment criterion and "can perform the essential functions of the position without endangering the health and safety of [herself] or others." 28 C.F.R. § 1613.702(f).

As a result, plaintiff is entitled, pursuant to the Act, to receive back pay, back benefits, attorney fees, and the next available RN position at the Wichita V.A.

IT IS ACCORDINGLY ORDERED this 14 day of April, 1988, that plaintiff's motion for summary judgment is granted. Counsel will prepare application for attorney fees and will share the same with counsel for the United States in the interest of reaching an accord. If this fails, counsel is to timely file the application with the court.