**Dianne KENT, by her Guardian James J. GILLESPIE, Plaintiff,**

v.

**Edward DERWINSKI, et al., Defendants.**

**No. CS–90–226–FVS.**

United States District Court,
E.D. Washington.

Sept. 19, 1991.

---

Alan L. McNeil, University Legal Assistance, Spokane, Wash., for plaintiff.

Carroll Gray, Asst. U.S. Atty., U.S. Attorney's Office, Spokane, Wash., for defendants.

## MEMORANDUM OPINION

VAN SICKLE, District Judge.

### SUMMARY OF THE OPINION

The plaintiff, Dianne Kent, is a 40 year old mentally retarded woman with an emotional handicap. On February 3, 1985, Ms. Kent was hired by the defendants, the Veterans Administration Medical Center (VAMC), under a special program for hiring handicapped individuals. Ms. Kent was "otherwise qualified" for her job within the meaning of 29 U.S.C. § 791.

While working at VAMC, Ms. Kent was subjected to taunting and ridicule about her handicap by her co-workers. Ms. Kent also was disciplined by her supervisor at VAMC for behavior that was the result of her handicap.

Although VAMC management and Ms. Kent attempted to improve her situation at VAMC, the working conditions grew worse. By June of 1988, Ms. Kent found her work situation intolerable and resigned from her job.

The Rehabilitation Act of 1973, 29 U.S.C. § 791, prohibits an employer from discharging an "otherwise qualified" employee because of a handicap, if the handicap can be accommodated without undue hardship on the employer. The court determined in this case that VAMC had failed to make adequate accommodations for Ms. Kent's handicap. The lack of accommodations created the intolerable work situation, which resulted in a constructive discharge of Ms. Kent.

The Court orders VAMC to reinstate Ms. Kent in her job, to pay the costs of counselling and training to prepare Ms. Kent to re-enter the work force, and to pay Ms. Kent's attorneys' fees in this litigation.

### JURISDICTION

Plaintiff's cause of action arises under the Rehabilitation Act of 1973, 29 U.S.C. § 791. This court has jurisdiction under 28 U.S.C. § 1331, and 28 U.S.C. § 1346(b). Venue properly lies in the Eastern District of Washington. Jurisdiction and venue are not disputed.

### PROCEDURAL HISTORY

Plaintiff brought this action in federal court pursuant to 29 U.S.C. § 791, the Rehabilitation Act of 1973, and 28 U.S.C. § 2674, the Federal Torts Claims Act. The court partially granted the defendants' motion for a summary judgment, dismissing plaintiff's tort claims under FTCA. Prior to filing this suit in federal court, plaintiff

had filed a discrimination complaint with the Equal Employment Opportunity Office. A nonjury trial was commenced on August 14, 1991, to decide the Rehabilitation Act claim.

## I. FINDINGS OF FACTS

### A. Dianne Kent's Biographical Information

1. Dianne Kent, plaintiff, is a 40 year old handicapped woman. She was hired by the defendants, the Veterans Administration Medical Center, Spokane (hereinafter VAMC) on February 3, 1985, through a special program for hiring handicapped employees.

2. Ms. Kent is one of 17 children in her family and spent most of her childhood in a school for retarded individuals. Prior to moving to Spokane, Ms. Kent had lived in California, where she lost her job because of her abuse of alcohol. After moving to Spokane, Ms. Kent lived with her father and took care of her siblings, until she had a fight with her father and moved out of his house.

3. Ms. Kent's handicap consists of both mental retardation and an emotional disability. Ms. Kent's emotional problems result in her difficulties with interpersonal relations, anxiety regarding being successful in her job, an important need to be accepted by her co-workers and supervisors, significant sensitivity to derogatory comments and criticism, a tendency to mumble and use profanity, and behavior that includes emotional outbursts.

4. Plaintiff's expert witness, Dr. Dennis Pollack, testified that Ms. Kent has borderline intelligence, with better verbal abilities than organizational strengths, and has been a victim of family abuse. Dr. Pollack diagnosed Ms. Kent as being depressed and schizophrenic, but not paranoid or delusional. Dr. Pollack testified that Ms. Kent needed a structured work environment with specific directions in order to be a successful employee.

5. The defendant's expert witness, Dr. Joseph Grismer, diagnosed Ms. Kent as paranoid schizophrenic. Dr. Grismer testified that Ms. Kent's psychiatric condition could compromise her work performance and that her mental condition would deteriorate if she ceased her medication or used alcohol. Dr. Grismer further testified that if Ms. Kent remained on her medication she could probably maintain her work performance.

6. Ms. Kent is viewed as a credible witness both from personal observation of her as she gave testimony, the events that she recounted on the stand, and from the testimony of other witnesses.

### B. Dianne Kent's Training and Employment

7. In October of 1983, Ms. Kent entered a special program at the Inland Empire Goodwill Industries (hereinafter Goodwill) aimed at rehabilitation and vocational training of handicapped individuals. (Exhibit 2 at 2.) Ms. Kent developed and improved her skills for working successfully in a laundry despite her handicap. (Exhibit 2.) Ms. Kent completed the program at Goodwill. Assisted by Goodwill, Ms. Kent was hired on February 3, 1985, by VAMC for a permanent, part-time position in their in-house laundry.

8. In 1985, at the time that Ms. Kent left Goodwill, a vocational counsellor evaluated Ms. Kent as being a good, dependable worker, but with some problems dealing with co-workers as well as some problems in following directions from her supervisor. (Exhibit 2 at 31.)

9. Prior to hiring her, VAMC had full access to all of Ms. Kent's employment records and evaluations conducted by Goodwill during her tenure there.

### C. Dianne Kent's Work Experience at VAMC With Joe Smith as Supervisor

10. From her first day at VAMC in February, 1985, until June, 1986, Joe Smith was Ms. Kent's supervisor. Mr. Smith was a retired military sergeant with over twenty-two years of experience working with a variety of people. Mr. Smith was fully aware of Ms. Kent's handicaps when she

was hired. During the time that he supervised Ms. Kent, Mr. Smith rated her as "fully satisfactory" in her job evaluations at VAMC.

11. From the beginning of her employment with VAMC, Ms. Kent was taunted by co-workers as being "brain dead," or a "droolie," or looking like she was "hungover," or had been "sniffing glue." Mr. Smith would immediately reprimand the individuals who were taunting Ms. Kent and make it clear to them that he would not tolerate such taunting.

12. Like other new employees, Ms. Kent was not as fast on her job when she was new, but she gained speed after she had become familiar with the job. Mr. Smith's method of instructing and correcting Ms. Kent was to explain quietly to Ms. Kent what she was doing wrong. By the time that he left VAMC, Mr. Smith had ranked Ms. Kent as "fully satisfactory" and had no qualms about retaining Ms. Kent in her position.

### D. Susan Randall as Supervisor in the Laundry

13. In June, 1986, Susan Randall became Ms. Kent's supervisor. The position of supervisor at the VAMC laundry was Ms. Randall's first supervisory position. Ms. Randall previously worked as a secretary and was selected by VAMC to participate in an "upward mobility" program. Ms. Randall had a G.E.D. and had completed a special training program for Veterans Administration Laundry supervisors. However, Ms. Randall was inexperienced both as a supervisor and in working with a variety of people.

14. Ms. Randall was later terminated from a different Veterans Administration Medical Center for reasons not related to the instant case. Ms. Randall was not present at the trial, nor was her testimony preserved beyond what was available through her testimony at the EEO investigation. (Exhibit 1, B-3.) The very brief explanation given by Mr. Williams, the personnel manager of VAMC, that he tried to locate Ms. Randall in the American Lake area (which was Ms. Randall's last place of employment with the Veterans Administration) and in the Chicago area (which was Ms. Randall's residence prior to moving to the Spokane area) was not a satisfactory explanation for her absence. The court, unfortunately, did not have the opportunity to hear and observe Ms. Randall testify.

15. When she was designated to become the supervisor in the laundry, Mr. Smith spent time talking with Ms. Randall to familiarize her with the employees and the work situation in the laundry. Mr. Smith explained to Ms. Randall that Ms. Kent was handicapped and that she should talk to Ms. Kent to correct her, but not yell at her.

16. During the transition period between Mr. Smith and Ms. Randall as supervisors in the laundry, VAMC management was faced with "A 76," a Congressional proposal to determine whether services provided by the public sector could more efficiently be provided by the private sector. The concern for high productivity levels in order to justify retaining the laundry at the VAMC definitely created job security anxiety for the management and for the laundry workers.

17. In July of 1986, one month after becoming supervisor in the laundry, Ms. Randall complained to Ms. Jacqueline Ross in personnel about Ms. Kent's productivity levels and about her general appearance. In addition, Ms. Randall complained that Ms. Kent would not make eye contact, not perform like the other laundry workers, not talk, and would slam things. At the time, Ms. Randall was holding Ms. Kent to a WG 2 standard, which was the employment grade held by the other laundry workers, until Ms. Ross explained that Ms. Kent was at the WG 1 level and could only be held to that level of work.

18. In December of 1986, Barbara Pyle, a rehabilitation specialist from Goodwill Industries, evaluated Ms. Kent's productivity at VAMC, both in announced and unannounced visits. During one announced visit, Ms. Pyle recorded Ms. Kent as performing over 132% of the work standard for working with the sheet feeder. (Exhibit 1, C-8.) Ms. Pyle's overall evaluation was

that Ms. Kent performed her work above the standards required in her position. *Id.*

19. In December, 1986, Ms. Pyle met with Ms. Kent, Ms. Randall, Mr. Roger Eppler (Ms. Randall's supervisor), and Mr. Kevin Canwell (Ms. Kent's union representative) to discuss Ms. Kent's working abilities. Ms. Pyle's written report of the meeting indicates that Ms. Kent was capable of doing the work, but was having problems with interpersonal dynamics with her supervisor and her co-workers that were interfering with her productivity. (Exhibit 2 at 33.)

### E. Susan Randall's Treatment of Dianne Kent

20. After Ms. Kent's evaluation tests indicated that her productivity level was within the standards set for a WG 1, Ms. Randall's complaints focused on Ms. Kent's emotional instability.

21. Ms. Randall did not suppress the taunting of Ms. Kent by co-workers as Mr. Smith had done. The taunting of Ms. Kent continued through 1987. (Exhibit 1, B–10 at 4.) In addition, the workers in the VAMC laundry fell into two factions: one group supporting Ms. Randall, and one group opposed to Ms. Randall. The group supporting Ms. Randall was considered by the nonsupporting group as being "favored" by Ms. Randall. Ms. Kent was in the nonfavored group. Clearly, dissension and disagreements between Supervisor Randall and the laundry employees and among the employees was rampant.

22. From the time that Ms. Randall became the supervisor at the laundry, Ms. Kent felt stress from the threat of an "A 76" review, from trying to withstand the taunting of her co-workers, and from trying to oblige and please Ms. Randall, who was difficult to please. The result was increased apprehension on Ms. Kent's part and decreased productivity.

23. Ms. Randall's response to the situation was to make comments to Ms. Kent such as "Can't you work any faster than that?" When Ms. Kent had disagreements with other workers, Ms. Randall would focus on Ms. Kent's participation in the dis-

agreement, usually by removing Ms. Kent to an office where Ms. Randall would lecture Ms. Kent for up to two hours on getting along with co-workers. Ms. Randall's other supervisory methods with Ms. Kent included ordering Ms. Kent to stand against the wall and not work, grabbing Ms. Kent's arm in the restroom and ordering her to keep silent about the conditions in the laundry, and criticizing Ms. Kent for her behavior, which was due to her handicap.

### F. VAMC Management's Accommodations to Ms. Kent's Handicap

24. Hiring Ms. Kent on a part-time basis was the initial accommodation VAMC made for her handicap. Management did explain her handicap to Supervisor Smith, and how to appropriately supervise and discipline her. Management also attempted to accommodate Ms. Kent's handicap by providing training and counselling for Ms. Randall concerning the best methods of supervising and disciplining Ms. Kent. VAMC also required the workers in the laundry to attend two sensitivity training sessions in 1987 on how to work with handicapped co-workers. (Exhibit 1, B–10 at 4.) VAMC's accommodations included involving Goodwill counsellors in the resolution of Ms. Kent's problems, and trying to understand Ms. Kent's behavior within the framework of her handicap. Ms. Kent was counselled by Mr. Kevin Canwell (the union representative), counsellors from the Department of Vocational Rehabilitation, and Ms. Ross (the personnel management specialist), as to how to improve her interpersonal skills.

25. John Hempel, the Associate Director of VAMC, appointed Mr. Kevin Canwell, a union steward, to be Ms. Kent's personal representative in any formal disciplinary sessions involving Ms. Kent. Mr. Canwell had been assigned by the union president to deal with the laundry employees' difficulties in dealing with management. Mr. Canwell spent a great deal of time talking with laundry workers and observing the conditions in the laundry. Mr. Canwell

saw the situation in the laundry firsthand and spoke with both employees and management about the problems that he observed. He went to management with Ms. Kent's complaints about her treatment by Ms. Randall and her co-workers. Mr. Hempel provided an "open door" policy to Mr. Canwell to bring any problems or grievances directly to him. Mr. Hempel would directly investigate the problems that Mr. Canwell would raise and assure him that they would not happen again. However, recurrences did happen. Ms. Kent's complaints regarding the treatment that she received in the laundry began in 1986 and were not resolved by the time that she resigned in 1988.

26. While VAMC management expressed an intent to use a "soft approach" of discipline with Ms. Kent, Ms. Randall continued to lecture Ms. Kent and discipline her in a manner and frequency that differed from the other workers in the laundry.

27. Management considered reassigning Ms. Kent to another area of the medical center, but they did not feel that she was qualified to work in any other area because of her limited skills and her sensitivity to pressure situations. VAMC did not consider transfer of Ms. Randall to another area was appropriate, because there were no formal findings that she warranted a transfer to another area.

28. Despite her criticism of Ms. Kent, Ms. Randall gave Ms. Kent a "fully satisfactory" rating for the 1986–87 evaluation period. Ms. Kent was moved out of a probationary status into a career appointment. Ms. Randall rated Ms. Kent as "fully successful" for the evaluation period of 1987–1988.[1]

29. After a follow-up evaluation of Ms. Kent at VAMC on January 28, 1987, Ms. Pyle reported that Ms. Kent was working very efficiently and that her supervisor reported her as having "no problems." (Exhibit 2 at 32.)

30. VAMC was fully aware of Ms. Kent's emotional and mental handicaps. Management partially accommodated the handicaps by hiring Ms. Kent for the laundry and providing some sensitivity training to her supervisor and co-workers. However, VAMC failed to fully accommodate Ms. Kent's handicap by failing to provide timely and adequate supervision of the work place. Despite Ms. Kent's complaints to VAMC management and a discrimination complaint filed to the Equal Employment Opportunity Commission in November of 1987, Ms. Kent's working conditions did not improve. Ms. Kent continued to be subjected to taunting by her co-workers and inappropriate disciplinary measures by her supervisor.

## G. Effects on Ms. Kent

31. During Ms. Kent's employment with VAMC she was hospitalized twice for breakdowns. The first hospitalization was in July, 1986, within weeks after Ms. Randall became the laundry supervisor. The second time was in 1987 after a flare-up with co-workers, which was followed by Ms. Kent's attempt to swallow her fist.

32. Ms. Kent resigned on June 16, 1988. On the day when she first announced her intention to resign, Ms. Kent spoke with a number of people including Mr. Canwell, Ms. Ross, and Mr. Hempel. Mr. Canwell said nothing to Ms. Kent to encourage her to stay at VAMC. He felt sorry for her having to endure the treatment that she had received from her supervisor and co-workers, and felt that Ms. Kent's situation was hopeless. Each of the members of VAMC management encouraged her not to resign and to consider alternative action, such as taking some time off. Mr. Hempel refused to accept her resignation until she thought about it overnight. The next day Ms. Kent's resignation was accepted by VAMC.

## II. DISCUSSION OF LAW

 Violation of 29 U.S.C. § 791 requires that a plaintiff prove three elements in order to establish a prima facie case of discrimination: (1) plaintiff is a handi-

---

1. Ms. Randall's evaluation of Ms. Kent for the period of June 25, 1987 to March 31, 1988, is plaintiff's exhibit to Defendants' Motion for Summary Judgment. (Ct.Rec. 19 at H.)

capped person within the meaning of the statute; (2) plaintiff is an otherwise qualified individual; and (3) plaintiff was terminated because of her handicap. 29 *U.S.C.* § 791 et. seq.; *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir.1990); *Thornhill v. Marsh*, 866 F.2d 1182, 1183 (9th Cir.1989).

Both parties have stipulated that Ms. Kent is a handicapped person within the meaning of the statute. The first element of the plaintiff's claim is thus satisfied.

### A. Otherwise Qualified

■ The Ninth Circuit has adopted a two prong test to determine if a handicapped person is "otherwise qualified" within the meaning of 29 U.S.C. § 791: (1) Is the worker presently qualified to perform the essential requirements of the job without a reasonable probability of substantial injury to the worker or others? If yes, then the individual may not be terminated or denied employment on the basis of the handicap. If the answer to the first prong is no, then a second prong is analyzed: (2) Can reasonable accommodations be made, without undue hardship to the employer, sufficient to enable the worker to perform the essential requirements of the job without a reasonable probability of substantial injury to the worker or others? *Mantolete v. Bolger*, 767 F.2d 1416, 1423 (9th Cir.1985). The Ninth Circuit further noted in *Thornhill v. Marsh*, 866 F.2d 1182 (9th Cir.1989), that "an individual is 'otherwise qualified' if he is 'able to meet all of a program's requirements in spite of his handicap.'" 866 F.2d 1182, 1183–84 (9th Cir.1989) (citing *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979)).

■ To determine if Ms. Kent has satisfied the first prong of the "otherwise qualified" test, we first look to her employment history with Goodwill Industries. (Exhibit 2.) The evaluations made at Goodwill Industries, as reflected in the record and in testimony, indicate that Ms. Kent consistently improved in her abilities to mechanically perform her job in the laundry, increasing her speed and productivity levels, as well as improving in her abilities to work with others and to receive criticism from her supervisors. In 1985, Goodwill Industries recommended Ms. Kent to VAMC as being ready to join the competitive work force. Goodwill's recommendation that Ms. Kent was ready for employment at VAMC is an indication that she was qualified for the job.

At the end of her first year with VAMC in 1986, Ms. Kent was evaluated by her former supervisor, Mr. Smith, as being "fully satisfactory" in her job performance. Ms. Kent was moved out of probationary status in 1986 and was promoted to a permanent part-time position, which is a clear indication that VAMC considered Ms. Kent as qualified for her job. Ms. Kent's work skills were evaluated for the period of 1986–1987 by Ms. Pyle, a vocational specialist from Goodwill Industries, who rated Ms. Kent as being capable of physically performing her job, although as having some interpersonal problems with co-workers, specifically with her supervisor, Ms. Randall. (Exhibit 2 at 32.) Ms. Randall ranked Ms. Kent's performance for the period of June 26, 1987, to March 31, 1988 as being "fully successful," with some reservations regarding Ms. Kent's inability to work well with others.

The defendants' only verified concerns regarding the plaintiff's qualifications for the job stem from the plaintiff's handicap: interpersonal problems and emotional outbursts.[2] The court finds that Ms. Kent is able to perform the essential functions of the job and is "otherwise qualified," thereby satisfying the second element required by 29 U.S.C. § 791 of the Rehabilitation Act.

### B. Accommodations

■ Even if it is argued that Ms. Kent was not able to perform the essential functions of the job, she would still be "otherwise qualified" under the second prong of the otherwise qualified test: Can reasonable accommodations be made, without undue hardship to the employer, sufficient to

---

**2.** There has been no evidence presented that Ms. Kent's performance at the laundry presented any risk of injury to herself or to her co-workers.

enable the worker to perform the essential requirements of the job without a reasonable probability of substantial injury to the worker or others? *Mantolete v. Bolger,* 767 F.2d 1416, 1423 (9th Cir.1985).

The complaints directed by VAMC against Ms. Kent concern Ms. Kent's sensitivity to criticism from Ms. Randall, sensitivity to co-workers' derogatory taunting of her handicap, and sensitivity to stress in the work place. The defendants maintain that they accommodated Ms. Kent's handicap by requiring all of the laundry workers to attend sensitivity training sessions that focused on working well with other employees, especially those with handicaps. The sensitivity sessions included training in "appropriate remarks" and "appropriate jokes" to make in the work place to co-workers with disabilities. However, defendants' efforts were not timely and did not involve follow-up contact with co-workers to enforce the position that taunting and inappropriate remarks would not be tolerated.

VAMC contends that accommodation of Ms. Kent's handicap was a "soft approach" to disciplining and supervising Ms. Kent which avoided giving Ms. Kent direct criticism or undue stress. However, Ms. Randall did not consistently comply with a "soft approach" to disciplining Ms. Kent. Until she resigned from VAMC in 1988, Ms. Kent was subjected to long lectures by Ms. Randall and offhand remarks concerning her productivity levels.

There is every indication that if VAMC had effectively followed through on the accommodation methods that it began under Mr. Smith, Ms. Kent would have been able to continue as a productive employee at VAMC. Such accommodations are consistent with good management techniques and are not an undue hardship on the defendants, as evidenced by their use by Mr. Smith. The court also finds that the defendants' failure to follow-up on sensitivity training and "soft approach" discipline resulted in the ineffectiveness of the attempted accommodations.

The conclusion of the court is that even though efforts were made to accommodate Ms. Kent's handicap by training, counselling and discussion, no real change took place. Ms. Randall continued to make numerous critical remarks to Ms. Kent about her work productivity ("Can't you go any faster than that") and to single her out for discipline if any dispute arose involving her. Co-workers continued the taunting and name calling.

The court determines that the plaintiff has satisfied the second prong of the "otherwise qualified" test. Clearly accommodations could be made by the employer that would not be an undue burden on the employer that would still enable the plaintiff to perform the essential requirements of the job.

### C. Termination

■ Thus, we turn to the third element of the plaintiff's *prima facie case:* whether the plaintiff was terminated because of her handicap. *Mantolete v. Bolger,* 767 F.2d 1416, 1423 (9th Cir.1985). Plaintiff contends that her termination was in the form of constructive discharge. The test for constructive discharge is whether, judging from the totality of the circumstances, a reasonable person in the employee's position would feel that she was " 'forced to quit because of intolerable and discriminatory working conditions.' " *Watson v. Nationwide Ins. Co.,* 823 F.2d 360, 361 (9th Cir.1987) (quoting *Satterwhite v. Smith,* 744 F.2d 1380, 1381 (9th Cir.1974)). The Ninth Circuit found as a matter of law that constructive discharge had occurred when an employee was threatened with bodily harm, pushed, harassed, and deprived of sufficient work instructions which impeded his ability to perform his job. *Ford v. Alfaro,* 785 F.2d 835, 841–42 (9th Cir.1986).

■ In this case Ms. Kent was subjected to taunting by her co-workers, who ridiculed her because of her handicap. In addition, Ms. Kent was subjected to inappropriate discipline by her supervisor, including being forced to stand by a wall, being subjected to lectures which continued over several hours, and being criticized for her behavior, which was due to her handicap.

Despite Ms. Kent's attempts to remedy her work situation by talking with Ms. Randall, trying to please Ms. Randall, talking with her mental health counsellor, talking with a vocational counsellor from Goodwill Industries, and presenting her complaints to her union representative, no significant improvements in Ms. Kent's working environment had been made, or were likely to be made, in the foreseeable future.

The court vividly recalls Mr. Canwell's testimony that at the time Ms. Kent stated she wanted to resign he felt he could not encourage her to stay. After months of meetings, discussions, and counselling he had given up hope of Ms. Kent's work situation ever improving.

The court notes that management made a good faith effort to dissuade Ms. Kent from leaving and asked her to reconsider. Those laudable efforts were unfortunately too little, too late. The series of events in the work place had not changed, did not have any indication of changing soon, and were so overwhelming that the last minute management efforts were simply not enough.

The court finds that a reasonable person, looking at the totality of the circumstances, would have found Ms. Kent's work situation intolerable and discriminatory because of her handicap and would have felt forced to quit. The court holds that Ms. Kent was constructively discharged from her job because of her handicap. Plaintiff has satisfied the third element required for her case.

### III. DAMAGES

■ Plaintiff requests reinstatement in her position with VAMC, payment for professional counselling and training necessary for her to re-enter the work force, future pay if reinstatement is not granted, back pay for the period from her constructive discharge to the present, and attorneys' fees. The Ninth Circuit has found that courts may grant the " 'full panoply of remedies, including equitable relief and monetary damages' " to successful plaintiffs under section 504 of the Rehabilitation Act. *Smith v. Barton*, 914 F.2d 1330, 1338

(9th Cir.1990) (quoting *Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1107 (9th Cir.1987)).

It is evident that VAMC traditionally has been recognized for employing handicapped individuals and working with them to become valued members of the work place. It is also clear that Ms. Kent is a capable, hard working employee who would best benefit psychologically by being reinstated in her job at VAMC as well as benefitting VAMC by becoming a responsible employee. Plaintiff's request for reinstatement is granted. The Veterans Administration Medical Center, Spokane, shall reinstate Ms. Kent in her job at the laundry, after an appropriate program of rehabilitation and work hardening schedule.

Evidence was presented that Ms. Kent will require counselling and rehabilitative training in order to successfully re-enter the work force. The court orders VAMC to pay the reasonable costs for the necessary period of counselling and rehabilitation for Ms. Kent.

The court orders Ms. Kent's reinstatement on condition that Ms. Kent continue to follow medical advice as her health warrants, including taking medication, and continue her best efforts to perform her job as she has previously demonstrated. This reinstatement by the court is not intended to grant Ms. Kent a permanent position with VAMC. It is done on the basis that Ms. Kent will follow indicated appropriate medical advice and give her best efforts to perform her job. The reinstatement is also done on the basis that the Veterans Administration Medical Center understands that Ms. Kent is a handicapped person and will accommodate her handicap.

The plaintiff requested that she be granted future pay, if reinstatement was not granted. Since the court has granted reinstatement, the request for future pay is moot.

■ The plaintiff also requested back pay from the date of the constructive discharge to the date of reinstatement. The Ninth Circuit has held that in similar cases involving age discrimination, "the plaintiff

**1042**

must attempt to mitigate damages by exercising reasonable care and diligence in seeking reemployment after termination." *Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338, 1345 (9th Cir.1987) (citing *Jackson v. Shell Oil Co.,* 702 F.2d 197, 201 (9th Cir.1983)).

The court understands that Ms. Kent's attempts to find other employment would not be the same as a nonhandicapped employee. However, there has been no evidence presented of any efforts made by Ms. Kent toward training, counselling, or searching in any way for employment. Ms. Kent certainly was aware of services available at Goodwill for such type of assistance. Yet there is no evidence of any efforts by Ms. Kent. The failure of any action towards mitigation by this handicapped person leaves the court no alternative but to deny damages for lost wages.

 The plaintiff also requested that the court grant her attorneys' fees. The Ninth Circuit has held that the court may allow the prevailing party, other than the United States, reasonable attorneys' fees to encourage private enforcement of the act. *John Doe v. Attorney General of the United States, The Director of the Federal Bureau of Investigation; Richard Held, Special Agent in Charge of the San Francisco Office, Federal Bureau of Investigation,* 941 F.2d 780, 792 (9th Cir.1991). Therefore, the court grants the plaintiff reasonable attorneys' fees.

Plaintiff's counsel shall submit affidavits setting out the basis for attorneys' fees and amounts sought. Plaintiff's counsel shall also submit affidavits setting out the basis for the costs of Ms. Kent's counselling and rehabilitative training prior to reinstatement. Defendants shall have the opportunity to rebut and respond to plaintiff's requests. Unless agreement is reached concerning attorneys' fees and counselling costs, plaintiff shall schedule the matter before the court.

Plaintiff also requested injunctive relief to prohibit VAMC from discriminating against handicapped individuals. The court notes that the granting of plaintiff's request for reinstatement and the continuing prohibition of discrimination against handicapped persons as provided in the Rehabilitation Act renders such relief unnecessary.

## CONCLUSION

Therefore, the court determines that the plaintiff, Ms. Kent, was a handicapped individual who was otherwise qualified for her job at Veterans Administration Medical Center, Spokane, within the meaning of 29 U.S.C. § 791. The court also finds that the defendants' failure to accommodate the plaintiff's handicap resulted in the constructive discharge of the plaintiff because of her handicap, thereby violating 29 U.S.C. § 791.

The court orders the defendants to reinstate Ms. Kent in her job after she has completed an appropriate rehabilitation program and work hardening schedule. This reinstatement is conditioned on Ms. Kent's compliance with medically indicated advice and Ms. Kent's continued best efforts to perform at her full capacity.

The plaintiff's request for damages for lost future wages is rendered MOOT by reinstatement. The plaintiff's request for damages for lost wages from the time of termination to trial is DENIED for failure of the plaintiff to mitigate.

Plaintiff's request for attorneys' fees is GRANTED. Affidavits setting forth the basis for fees and the amounts sought are to be filed within 30 days. Defendants shall have 30 days to respond. Plaintiff shall note the attorneys' fees matter to be heard in a timely manner.

IT IS SO ORDERED.