**MIAMI UNIVERSITY, Appellant,**

v.

**OHIO CIVIL RIGHTS COMMISSION et al., Appellees.**

[Cite as *Miami Univ. v. Ohio Civ. Rights Comm.* (1999), 133 Ohio App.3d 28.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA98–07–147.

Decided April 5, 1999.

30

*Millikin & Fitton Law Firm* and *James E. Michael,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Barbara J. Morsa,* Assistant Attorney General, for appellee Ohio Civil Rights Commission.

POWELL, Presiding Judge.

This is an administrative appeal from a judgment of the Butler County Court of Common Pleas. That court affirmed (as modified), a decision of appellee, Ohio Civil Rights Commission ("the commission"), which found that appellant, Miami University ("Miami"), unlawfully discriminated against Debbie Crouse and other mentally retarded applicants for employment at Miami. We affirm with additional modifications to the relief ordered.

On August 10, 1990, Dennis Burger, an employee of Miami Valley Industries ("MVI"),[1] filed a discrimination charge against Miami with the commission. Miami personnel had informed Burger that a civil service examination was required for all applicants for custodial or food service worker positions. Burger charged that such a test unfairly discriminated against mentally retarded applicants.

On September 19, 1990, Crouse applied for employment with Miami. The application form she filled out initially was for a custodial or food service worker position. Crouse took a written test and scored forty out of a possible one hundred. A score of seventy was required to be placed on the eligible list. Crouse filed a discrimination charge with the commission on July 2, 1991.

In 1991, Miami hired a consulting human resources firm, Mercer Corporation, Inc. ("Mercer"). Mercer employees performed a job analysis of Miami's food service worker ("FSW") and building service worker ("BSW") positions. Miami had determined that the term "building service worker" was more appropriate than custodian as it expected more from these workers than simply janitorial services. A professional Mercer employee, Jeanne Adkins, visited the campus for one day and toured various job sites. Adkins also reviewed job descriptions and position information questionnaires ("PIQs") for BSW and FSW positions. The

---

1. Miami Valley Industries provides job training and support to assist mentally retarded consumers in entering the work force.

PIQs had been completed by incumbents in the positions and detailed the content of FSW and BSW jobs on a daily basis by allocating percentages of time for various functions performed during the work day. After completing the job analysis, Mercer recommended that Miami use a written test for the FSW and BSW positions. The recommended test consisted of a reading index and a math index. Mercer recommended that Miami use the entire reading index and the first three sections of the math index. The reading index consists of five parts. Each part requires an applicant to have reading skills at a progressively higher grade level. The first index is at a first grade level. The next is at a second grade level. The third section tests at a 4.5 grade level and the fourth and fifth sections are at the sixth and ninth grade levels respectively.

Crouse took this test on August 20, 1992. She received accommodations in testing. Crouse was allowed to take the test in a private room, the test questions were read to her, and time limitations were waived. Crouse passed the first two reading indexes and failed the third by one point. She failed the final two reading indexes by a considerable margin. Crouse also failed the math indexes.

Following unsuccessful conciliation attempts, Crouse and Burger's discrimination charges were consolidated for disposition by the commission. A hearing was conducted March 8–9, 1993 and July 29, 1993.[2] Miami presented testimony from its personnel director and supervisors familiar with the work of BSWs and FSWs. Miami also presented testimony from the two Mercer employees, Adkins and Dr. Charles Schanie, who had performed the job analysis for FSW and BSW positions and recommended the use of the written test. Miami's witnesses testified that BSWs rotate positions and often work alone without extensive supervision. The testimony indicated that more supervision is available for FSWs.

The commission presented testimony from MVI employees who were familiar with Crouse's abilities and past work history. The commission also presented testimony concerning the use of job coaching[3] and other accommodations that

---

2. The hearing was initially conducted by hearing examiner Debra Tucker, who left employment with the commission. The hearing was concluded and the decision issued by hearing examiner Frederick Martens.

3. MVI provides job coaching by having employment training specialists first perform the job along with an incumbent in the position. The trainer then does the job alone and finally works along with the mentally retarded consumer. The trainer devises adaptations and visual cues in order to help the consumer learn the job. The trainer is available for supportive services thereafter. Ernest Nelson, an MVI employment training specialist who had worked with Crouse, testified that the average time spent with a consumer was approximately two weeks to a month, he testified that Crouse was a quicker than average learner and took only one week to learn a particular job he had trained her for. He testified that her employer on

enable mentally retarded individuals to perform work in food service and other competitive employment. The commission presented testimony from Dr. Neal Jaffe, a training development specialist who holds a doctoral degree in special education with a specialty in mental retardation. Jaffe had toured Miami and opined that Crouse and other mentally retarded persons could be trained to prepare and serve food in Miami's dining halls. Jaffe also opined that the test Miami had adopted did not measure the ability of a mentally handicapped person to perform a FSW job.

The hearing examiner made extensive findings of fact. He found that BSWs often work alone and supervisors are not readily available. He found, however, that FSWs do not generally work alone. Supervisors, cooks, and coworkers are on site and readily available. The hearing examiner noted that Mercer's recommendations for use of a reading test were based in part on the need for BSWs to read maintenance manuals and catalogs.

The hearing examiner found that Crouse had reading skills at a 3.8 grade level and math skills at a 3.5 grade level. He also found that she had many domestic skills, including cleaning, washing clothes and dishes, and complete meal preparation. The hearing examiner further found that Crouse was employable and had successfully held positions in food service. The hearing examiner found that MVI's training techniques had been proven effective and were provided at no cost for as long as needed to the employer and the disabled client.

The hearing examiner then found that Crouse could perform "the essential functions of the FSW position in a residence dining hall at Miami University." The hearing examiner found that the essential functions of that position included "preparation of meats, vegetables, fruit, gelatins, and beverages for cooking or serving by performing such tasks as washing, peeling, mixing, slicing, toasting, grilling, and frying." The hearing examiner found that Crouse could not perform all of the job duties of a FSW as she could not supervise students or read complex instructions. However, he found that FSWs do not routinely read complex instructions regarding the operation of cleaning machines, mix chemicals (as BSWs may), fill out complex forms, or perform tasks that require them to multiply or divide or do more than simple addition and subtraction.

The hearing examiner found that the test which Mercer had recommended did not measure the test taker's ability to perform the essential FSW job functions. The hearing examiner found that the test "was designed for BSWs who arguably have more complex job duties and perform them in a different environment."

---

that job stated that Crouse was fast, thorough, and reliable, and was often used to fill in for absent employees.

The hearing examiner also found that Miami had not shown that hiring Crouse would significantly increase the occupational hazards affecting her or other employees or the facilities in which the work is to be performed. The hearing examiner found that hiring Crouse would not require Miami to employ or train a handicapped person in a job that would require her routinely to undertake any task, the performance of which is substantially and inherently impaired by her handicap.

The hearing examiner recommended that Miami be ordered to cease and desist from discriminatory practices in violation of Ohio's handicap discrimination law and that the commission "order [Miami] to create a list of positions in the unclassified service to be assigned to mentally retarded employees, along with the pay grades, and tasks to be assigned." The hearing examiner further recommended that the commission order Miami to "employ mentally retarded persons who have been certified by the appropriate state vocational rehabilitation agency as (1) being able to perform the duties of the position, (2) physically capable of performing the work without hazard to the mentally retarded person or others, and (3) socially competent to maintain himself or herself in a work environment with or without help from an outside agency, other than [Miami]." The hearing examiner noted that these provisions were drawn from federal program requirements. Finally, the hearing examiner noted that the evidence established that Crouse could perform the duties of a FSW in a dining hall and that Miami should therefore be ordered to make her an offer of employment and back pay. The commission's cease and desist order adopted the hearing examiner's recommendations, without change.

Miami appealed the commission's cease and desist order to the common pleas court. Miami argued that the commission's order conflicted with civil service requirements, and that no viable charge of discrimination existed as Burger had withdrawn his charge and Crouse's charge did not survive her death.[4] Miami also argued that the evidence did not establish that Crouse was able to "safely and substantially perform the essential functions of the Building Services Worker and Food Service Worker positions at Miami University." Finally, Miami alleged that the "accommodations necessary to allow [Crouse] to perform the duties of either position would require Miami to fundamentally restructure its working environment."

The common pleas court found that in general Miami's objections were not well taken. The court found that the Ohio Constitution provides for exceptions to civil

---

4. The commission's cease and desist order was issued on September 29, 1995. Miami filed its petition for judicial review on October 10, 1995. Crouse died on February 29, 1996, and a suggestion of death was filed by the Attorney General on March 11, 1996.

service testing requirements. The common pleas court further found that Burger had testified that he wrote a letter indicating that he would "withdraw his charge if it would help Crouse's complaint move more quickly." However, the court noted that the commission then found probable cause for both Burger's charge and Crouse's charge and that they were consolidated for the hearing. The common pleas court also found that because Ohio's survival statute was to be liberally construed, Crouse's charge did survive her death.

On Miami's substantive claims, the common pleas court examined the evidence before the commission in light of the relevant handicap discrimination law on essential functions and reasonable accommodation and found that there was "sufficient, reliable and probative evidence to support the commission's findings that Crouse and others like her were discriminated against by the testing requirements at Miami University."

The common pleas court then reviewed the relief ordered by the commission and found that certain aspects of its cease and desist order were not in accordance with the law outlining the commission's powers. Specifically, the court found that the order to "create a list of positions in the unclassified service to be assigned to mentally retarded employees, along with the pay grades and tasks to be assigned" exceeded the authority granted to the commission by the legislature. The common pleas court therefore modified the commission's order pursuant to its authority under R.C. 4112.06(B).[5] Miami was given:

"[A] period of 120 days to present a plan to the commission which describes the particulars of how mentally handicapped individuals would become employees in the Food Service Worker and Building Services Worker positions.

"The plan should address all areas of concern noted by Miami in its brief, including which agencies are to be involved and how cognitively impaired persons are to be evaluated and referred for employment in these positions at Miami. The plan should also include a description of what reasonable accommodations, including job restructuring as defined by the Ohio Administrative Code, Miami finds necessary to accommodate these individuals."

Miami has appealed this decision and presents four assignments of error for our review:

"Assignment of Error No. 1:

---

5. R.C. 4112.06(B) provides that in judicial review of a commission order, "The court shall * * * have power to grant such temporary relief, restraining order, or other order as it deems just and proper and to make and enter, upon the record * * *, an order enforcing, modifying and enforcing as so modified, or setting aside in whole or in part, the order of the commission or remanding for further proceedings."

"The trial court erred in holding that the Ohio Civil Rights Commissions's findings and order were supported by reliable, probative and substantial evidence and were in accordance with law.

"Assignment of Error No. 2:

"The trial court erred in failing to vacate the order of the Ohio Civil Rights Commission on the basis that it requires Miami to make fundamental alterations in the essential nature of the job and imposes an undue financial and administrative burden.

"Assignment of Error No. 3:

"The trial court erred in failing to find the Ohio Civil Rights Commission's order unlawful because it is in conflict with constitutional civil service requirements.

"Assignment of Error No. 4:

"The trial court erred in holding that the Ohio Civil Rights Commission's [*sic*] had viable charges of discrimination before it when it entered its order."

In its first assignment of error, Miami argues that the hearing examiner erred in determining that Crouse could safely and substantially perform the essential functions of the job in question. To decide the issues raised under this assignment, we define terms such as "essential function" and "reasonable accommodation." We also assess the facts and legal standards under the applicable standards of review.

 In reviewing a decision of the commission pursuant to R.C. 4112.06, the common pleas court is required to give deference to the commission's resolution of factual issues. *Cleveland Civ. Serv. Comm. v. Ohio Civ. Rights Comm.* (1991), 57 Ohio St.3d 62, 65, 565 N.E.2d 579, 582–583. Findings of the commission as to facts shall be conclusive if supported by reliable, probative, and substantial evidence. *Id.* The common pleas court may set aside the administrative order if there exists legally significant reasons for discrediting certain evidence relied upon by the administrative body. *Asplundh Tree Expert Co. v. Ohio Civ. Rights Comm.* (1991), 68 Ohio App.3d 550, 589 N.E.2d 102.

 Our role as an appellate court in reviewing the judgment of the common pleas court, under R.C. 4112.06, is to determine whether the common pleas court abused its discretion. *Jackson v. Ohio Civ. Rights Comm.* (1989), 50 Ohio App.3d 13, 552 N.E.2d 237. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Id.* An appellate court shall affirm if there is a reasonable basis for the common pleas court's decision. *Columbus v. Liebhart* (1993), 86

Ohio App.3d 469, 621 N.E.2d 554; *Cleveland Civ. Serv. Comm. v. Ohio Civ. Rights Comm.*, 57 Ohio St.3d at 65, 565 N.E.2d at 582–583.

The commission found that Miami discriminated against Crouse based on her handicap. The common pleas court found that there was reliable, probative, and substantial evidence on this issue. We have carefully reviewed the evidence and find that the common pleas court did not abuse its discretion in affirming the commission's findings on the contested factual issues. We also hold that the relevant handicap discrimination law was correctly applied to the facts.

■ R.C. 4112.02 prohibits handicap discrimination in employment. To prove a prima facie case of handicap discrimination, the commission must show (1) that the complainant was handicapped, (2) that the employer's action was taken at least in part because the complainant was handicapped, and (3) that even though the complainant is handicapped, the complainant can safely and substantially perform the essential functions of the job in question. *Hazlett v. Martin Chevrolet, Inc.* (1986), 25 Ohio St.3d 279, 25 OBR 331, 496 N.E.2d 478.

Miami concedes that Crouse (and presumably any mentally retarded person) was a handicapped individual, and that "qualified handicapped person" means, with respect to employment, a handicapped person "who can safely and substantially perform the essential functions of the job in question, with or without reasonable accommodation." Ohio Adm.Code 4112–5–02(K). Miami contends that the commission did not make out a prima facie case of handicap discrimination for five separate reasons.

Miami first argues that the commission did not prove that Crouse could safely and substantially perform the essential functions of the job. Neither the statute nor the Ohio Administrative Code specifically define "essential functions." Ohio's handicap discrimination law was modeled after the federal Americans with Disabilities Act ("ADA"). The Ohio Supreme Court has held that appellate courts can look to regulations and cases interpreting the ADA for guidance in interpretation of the Ohio law. *Columbus Civ. Serv. Comm. v. McGlone* (1998), 82 Ohio St.3d 569, 573, 697 N.E.2d 204, 206–207.

The regulations implementing the ADA define "essential functions" as "those functions that the individual who holds the position must be able to perform unaided or with the assistance of a reasonable accommodation." Section 1630, App., Title 29, C.F.R. The regulations also provide that "a job function may be considered essential for any of several reasons, including but not limited to the following: (1) the function may be essential because the reason the position exists is to perform that function, (2) the function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed, and/or (3) the function may be highly specialized so

that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." Section 1630.2(n)(2), Title 29, C.F.R.

The hearing examiner found that the essential functions of a FSW in a large dining hall at Miami included "preparation of meats, vegetables, fruits, gelatins, and beverages for cooking or serving by performing such tasks as washing, peeling, mixing, slicing, toasting, grilling, and frying." The hearing examiner found that Crouse could perform those essential functions. Miami's brief correctly notes that in its review of the commission's order, the common pleas court "mistakenly recited in its opinion that the hearing examiner had found that Crouse could perform the functions of *both* the BSW and the FSW positions." (Emphasis added.) However, Miami only noted this error in a footnote and throughout its argument Miami points to testimony concerning BSWs to attempt to bolster its contention that the hearing examiner's conclusions and recommendations were not based on reliable, probative, and substantial evidence.

The significance of this conflating of the evidence on BSWs with that on FSWs cannot be overstated. The hearing examiner found that Crouse could perform the essential function of a FSW in a dining hall. The hearing examiner made no such finding concerning BSWs, explicitly noting that the evidence concerning the essential functions of most BSWs contrasted in important ways from that concerning FSWs. Therefore, our discussion will be limited to FSWs. Any relief requiring that mentally retarded applicants be placed in BSW positions was not supported by the evidence. However, the factual finding that Crouse could perform the essential functions of a FSW in a dining hall was supported by reliable, probative, and substantial evidence.

Miami has not provided a listing of the essential functions of the FSW dining hall position. Despite this omission, Miami argues that the hearing examiner's description of the essential functions of a FSW "overlooks the required judgment, discretion, independence, flexibility and supervision of others." This statement is belied by the fact that the hearing examiner specifically found that *BSWs* "generally work alone and supervisors are not readily available." A similar finding on the need for "judgment, discretion, independence and flexibility" was not made for FSWs in large dining halls because it was not justified by the testimony.

The hearing examiner did find that Crouse could not perform all of the job duties performed by FSWs, but found that the duties she could not perform were not essential functions of the position and could be "performed by other FSWs working with [Crouse]." We have found no legally significant reason to discredit the evidence relied upon for this finding. The hearing examiner relied on the PIQs in reaching this determination. Miami's own witnesses testified that the PIQs provided an important measure of the essential functions of the positions.

The hearing examiner found that Crouse could not supervise students or read complex instructions or fill out complex forms. However, he found that these duties accounted for only approximately ten percent of FSW job duties based on the PIQs.

■ We cannot find that the common pleas court abused its discretion in affirming this finding. Miami has pointed to no evidence that establishes that FSWs spend more than ten to fifteen percent of their time on functions that Crouse might not be able to perform. Applying the factors found in the federal regulations, we cannot find that supervision of students or reading of complex forms, for instance, are essential functions. The first criterion is that the "reason the position exists is to perform that function." It is clear that the FSW position does not exist to supervise students or read complex forms, it exists to accomplish the food preparation tasks listed in the job description. Further, there is no evidence indicating that incumbents in the FSW position are hired "for their expertise or ability" to supervise students or read complex forms.

This leaves the criterion based on "the limited number of employees available among whom the performance of that job function can be distributed." This criterion, like all essential function determinations, is highly fact-specific and has been litigated extensively.[6] The EEOC has noted that a small work force may mean that performance of a "multitude of different functions" by each employee "becomes more critical" and the "options for reorganizing the work become more limited." See 1630, App., Title 29, C.F.R. Conversely, if an employer, like Miami, has a large staff, it is harder for it to claim that delegating a particular function to other available employees would fundamentally alter the nature of the position. For instance, the commission's regulations explicitly note that if a clerical position largely consists of typing, but also requires some delivery tasks, the delivery tasks could be assigned to an ambulatory employee so that a nonambulatory handicapped person with satisfactory typing skills could be employed. Ohio Adm.Code 4112–5–08(E)(2)(a).

---

6. See, e.g., Wallace v. Veterans Administration (D.Kan.1988), 683 F.Supp. 758 (hospital was required to relieve recovering drug addict of duty to administer narcotics to patients; it was not essential that every nurse be able to administer the drug; accommodations such as job sharing or controlled patient assignment could enable plaintiff to perform the essential functions of a registered nurse adequately and safely); Ackerman v. W. Elec. Co. (C.A.9, 1988), 860 F.2d 1514 (telephone equipment installer's employer required to reassign to other employees the plaintiff's duties involving lifting more than twenty-five pounds or demolition of ironwork). Cf. Treadwell v. Alexander (C.A.11, 1983), 707 F.2d 473 (requiring other employees to perform duties such as operating motorboat, walking over rough terrain, or handling disorderly park visitors not a reasonable accommodation where one hundred fifty thousand acres had to be patrolled by two to four workers).

■ The handicap discrimination law does not permit the requirement that every employee must be able to perform every conceivable function of every job. Rather, the handicapped applicant or employee must be able to perform the essential functions with or without reasonable accommodation. In *Asplundh Tree Expert Co. v. Ohio Civ. Rights Comm.* (1991), 68 Ohio App.3d 550, 589 N.E.2d 102, for instance, the Tenth District Court of Appeals found that a tree trimmer could perform the essential functions of his job even after knee surgery left him with restrictions on lifting and climbing because other crew members could actually climb trees on the "infrequent occasions that such climbing was required or assist him when lifting weights in excess of thirty pounds." Here, although exact figures per job site were not provided, the hearing examiner noted that eighty-one FSWs are employed in residence dining halls and are supervised by cooks, senior cooks, food production leaders, food service supervisors, senior food service managers, dining hall managers, and assistant managers. The hearing examiner further found that "FSWs generally do not work alone and supervisors, cooks, and co-workers are on site and readily available." There was reliable, probative, and substantial evidence supporting this finding.

The common pleas court thus did not abuse its discretion in finding that Crouse could perform the essential functions of the FSW dining hall job. Those functions that she could not perform could be covered by other available employees.[7] Therefore, Miami's first and most important challenge to the commission's prima facie case is not well taken.

Miami next argues that the hearing examiner improperly found that "reasonable accommodation in this case could include allowing MVI to work on site with [Crouse]." Miami notes that the use of MVI's job coaches was included as part of the relief granted by the commission. Miami argues that job coaches are not a reasonable accommodation.

An employer is required to make reasonable accommodation to a handicapped individual unless the employer can demonstrate such an accommodation would impose an undue hardship on his business. Ohio Adm.Code 4112–5–08(E)(1); *Greater Cleveland Regional Transit Auth. v. Ohio Civ. Rights Comm.* (1989), 58 Ohio App.3d 20, 24, 567 N.E.2d 1325, 1328–1329. Examples of reasonable accommodations include "providing access to the job, job restructuring, acquisition or modification of equipment or devices, or a combination of any of these." Ohio Adm.Code 4112–5–08(E)(2). Examples of job restructuring include "realignment of duties, revision of job descriptions or modified or part-time work schedules." Ohio Adm.Code 4112–5–08(E)(2).

---

7. We note that this may limit the total number of mentally retarded employees that Miami could hire for any single residence dining hall.

The hearing examiner found that "reasonable accommodation in this case could include allowing MVI to work on site with [Crouse] and develop visual cues and other aides that have proven to be effective methods for training the mentally retarded. This could be done at no cost to [Miami]." Although Miami argued that allowing MVI to provide job coaching was not a reasonable accommodation, it did not point to any evidence in the record supporting this contention.[8] Furthermore, the common pleas court modified some aspects of the commission's cease and desist order (as discussed below) and stated that Miami could present a plan to the commission that would include reasonable accommodation. The common pleas court found that this modification of the order addressed Miami's argument that "it was being forced to allow a third party to participate in training on its premises." The common pleas court stated that Miami could evaluate its training program and investigate other possibilities available to it to train handicapped individuals.

On appeal, Miami states that the common pleas court "correctly struck down the commission's order that Miami utilize the job coaching services of MVI." Miami argues, however, that the common pleas court "failed to understand" that the finding of discrimination was premised on Miami's failure to voluntarily participate in the MVI program. Miami therefore argues that if it cannot be forced to utilize MVI's services, then it cannot be found to have discriminated because it did not use MVI in the first place.

■ Miami's argument overlooks important distinctions between finding discrimination and determining what type of relief is appropriate. Although similar considerations apply, the determinations are separate. The hearing examiner found that Crouse could perform the essential functions of the dining hall FSW position with the reasonable accommodation of job coaching. Because the common pleas court modified some of the overly broad aspects of the commission's cease and desist order and required Miami to propose a plan, the court indicated that it did not need to explicitly decide whether job coaching was indeed a reasonable accommodation.[9] Upon our review, we find that although the common pleas court may not have explicitly decided this issue, the hearing

---

8. Miami apparently believes that the unreasonableness of job coaching as an accommodation is self-evident. Because the parties will be working together to implement the relief ordered, we stress that handicap discrimination law is not a series of self-evident propositions. For example, the issue of whether a blind student could be accommodated in medical school was not self-evident and occasioned thoughtful analysis on both sides. *Ohio Civ. Rights Comm. v. Case W. Res. Univ.* (1996), 76 Ohio St.3d 168, 666 N.E.2d 1376.

9. However, the common pleas court noted that there was "insufficient evidence to show that allowing MVI or another third party to train and retrain handicapped individuals on site at Miami would impose an undue hardship on the employer."

examiner's initial determination was correct. Job coaching is a reasonable accommodation under the evidence presented.

Miami cites one case in support of its position that job coaches are a *per se* unreasonable accommodation. *EEOC v. Hertz* (Jan. 6, 1998), E.D.Mich. No. 96–72421, unreported, 1998 WL 5694. In *Hertz,* the car rental agency had voluntarily agreed to create special parttime positions for mentally retarded workers. The workers were accompanied by job coaches and it was undisputed that the workers could not perform their jobs without the coaches. The job coaches engaged in inappropriate behavior and were ordered (along with their clients) off the property. In finding that Hertz had not discriminated, the court quoted EEOC guidelines that acknowledged the role of job coaches in job training. These guidelines stated that reasonable accommodation must be determined on an "individualized, case by case basis" and under some circumstances an employer "may be required to provide modified training materials or a temporary 'job coach' to assist in the training of a qualified individual with a disability as a reasonable accommodation." *Hertz* at 6 (citing Section 1630.9, Title 29, C.F.R.). The court noted that there was no dispute "that the role of the job coaches in this case went far beyond that of 'job training.'" *Id.* The court reviewed applicable case law and stated that although "a temporary job coach providing job training to a qualified individual may be a reasonable accommodation, the clear implication is that a full-time job coach providing more than training to unqualified individuals is not." *Id.* The mentally retarded workers in *Hertz* had never worked without full-time job coaching assistance and would apparently always need such assistance. This is diametrically opposed to the evidence in this case that established that Crouse had never required job coaching beyond the first week or so in any of her previous jobs. We find that by its own language *Hertz* is distinguishable from this case and reject Miami's reliance on it as authority for its position.

 The hearing examiner found that requiring Miami to utilize MVI's free services was a permissible response to the proven discrimination. Competent evidence from an expert on job training for mentally retarded individuals was presented by the commission. Reliable, probative, and substantial evidence was presented that Crouse in particular had successfully utilized such temporary job coaches in the past. Miami presented no evidence to show that a temporary job coach was unreasonable. Accommodations for handicapped employees are unreasonable only if they place an undue hardship on the employer and the burden of showing undue hardship is on the employer. *Martinez v. Ohio Dept. of Adm. Serv.* (1997), 118 Ohio App.3d 687, 693 N.E.2d 1152. Although requiring Miami to pay for a full-time job coach would almost certainly constitute an undue hardship, it is undisputed that MVI's services are free. Although Miami may explore other options for accommodating any mentally retarded applicant for

employment who is eventually hired, it cannot continue to argue that job coaches are *per se* unreasonable. Therefore, the commission did not unlawfully premise its discrimination finding on the basis of Miami's failure to use such services, and Miami's second challenge to the commission's prima facie case is not well taken.

Miami next argues that Crouse was not an "otherwise qualified" handicapped individual, because she "could not obtain a passing score on a valid civil service test." In support of this contention, Miami states that the test that Mercer recommended did test for the aptitudes needed to perform the essential job duties. This appears to be an argument that reading and math skills were essential to perform the position of an FSW in a dining hall. This argument has been addressed above and will not be extensively repeated. The hearing examiner found that Jaffe's testimony was more credible than that of the Mercer employees on the need for reading in the FSW dining hall positions. This credibility determination was within the hearing examiner's discretion, and the common pleas court applied the correct standard of review in affirming.

■ Tests or qualification standards for employment must be reasonably related to the applicant's ability to do the job in question. See *Columbus v. Liebhart* (1993), 86 Ohio App.3d 469, 621 N.E.2d 554. Again, the distinction between the reading level required for BSWs and that routinely required for FSWs is critical to our analysis. Adkins testified that she looked at the PIQs and did a "reading level analysis of the kinds of materials that people read on the job." She noted that there are "66 different chemical products, cleaning products, materials that are used by *building service workers* at Miami." (Emphasis added.) Her testimony concerning the need for reading in the FSW dining hall positions was much less clear. Adkins did testify that FSWs need to be able to read recipes or food preparation guides. She gave as an example a "brochure on how to do garnishes."

■ It does not take expertise in training the mentally retarded to determine that although a worker can learn how to do garnishes by reading a brochure, he or she also can learn by being shown or by being shown pictures and other visual cues. Similarly, although Adkins stated that both FSWs and BSWS need to be able to read Miami's sanitation plan, other evidence in the record established that training on sanitation was provided and Miami did not rely solely on requiring its employees to read the plan. Many of the FSW PIQs did not mention reading at all. Therefore, we find that the hearing examiner had reliable, probative, and substantial evidence in support of its finding that Miami's test was "too broad and requires FSW applicants to have reading and math skills that go way beyond those required to perform the FSW essential job duties."[10] Therefore, Miami

---

10. The hearing examiner further found that the test "was designed for BSWs who arguably have more complex job duties and perform them in a different environment."

has not shown that Crouse was not "otherwise qualified" because she could not pass the test.

Miami next argues that the record does not show that Crouse was denied employment "because of" a handicap. Miami speculates that Crouse might not have been hired "even in the absence of the challenged test." Miami states that Crouse might not have been hired because she had indicated on an application form that she wanted to work days and Miami's FSW jobs are not 9:00 to 5:00 shifts. Miami therefore speculates that it may have had a nondiscriminatory reason to decline to offer Crouse employment. This is a reasonable speculation, but it is a speculation that would doom any handicap discrimination claim based on a failure to hire. Miami cites no authority in support of its position on this subissue. The commission did not have to disprove this negative possibility in order to establish its prima facie case.

As its final substantive challenge to the commission's order, Miami argues that the record showed that employment of Crouse "would require her routinely to undertake tasks the performance of which would be substantially and inherently impaired by her handicap and would result in significantly increased occupational hazards." Pursuant to R.C. 4112.02(L), Ohio's handicap discrimination law must not be construed to require

"[A] handicapped person to be employed or trained under circumstances that would significantly increase the occupational hazards affecting either the handicapped person, other employees, the general public, or the facilities in which the work is to be performed, or to require the employment or training of a handicapped person in a job that requires the handicapped person routinely to undertake any task, the performance of which is substantially and inherently impaired by the handicapped person's handicap."

The employer has the burden of proof on this affirmative defense. *Greater Cleveland Regional Transit Auth. v. Ohio Civ. Rights Comm.* (1989), 58 Ohio App.3d 20, 567 N.E.2d 1325. Furthermore, even if occupational hazards would be significantly increased, an employer may not rely on R.C. 4112.02(L) to refuse to employ a handicapped person if through reasonable accommodation the increased occupational hazards could be avoided. *Id.* (citing Ohio Adm.Code 4112–5–08[D][3][c] ).

The hearing examiner noted that pursuant to commission regulations, "only significant increases [in occupational hazards] justify a refusal to hire or train and the hazard must be reasonably foreseeable with a significant probability of happening." Report of Hearing Examiner (citing Ohio Adm.Code 4112–5–08[D][3][a] ). The hearing examiner found that Miami's evidence concerning occupational hazards was very general and largely concerned BSWs. In review-

ing the commission's findings on this issue, the common pleas court noted that Crouse could be trained on safety issues, and, thus, even if Miami had met its burden of showing significant increases in occupational hazards, reasonable accommodations were available to avoid the danger. We find no abuse of discretion. Miami did not establish any significant occupational hazard that could not be avoided through reasonable accommodation. Most of Miami's hypothetical examples involved BSWs (drain backups, chemical mixing, cleaning laboratories) or were not shown to be significant possibilities (choking customers), especially in light of the fact that FSWs in large residence halls do not work alone and thus would not face any potential occupational hazard without available assistance.

In summary, although the evidence was conflicting, the commissions's resolution of contested factual issues (such as how much reading was required for FSWs, the extent of Crouse's abilities, the credibility of the expert's opinion on job coaching as a reasonable accommodation, and the existence of potential occupational hazards) is entitled to deference. The common pleas court did not abuse its discretion in finding that the commission's findings of fact were supported by reliable, probative, and substantial evidence. The relevant handicap discrimination law on essential functions, reasonable accommodation, and occupational hazards was correctly applied. Therefore, the relief awarded to Crouse was fully justified.

We now turn to the more general relief outlined in the commission's cease and desist order. The commission's relief powers are delineated at R.C. 4112.05(G)(1) which states:

"If, upon all reliable, probative, and substantial evidence presented at a hearing under division (B) of this section, the commission determines that the respondent has engaged in, or is engaging in, any unlawful discriminatory practice, whether against the complainant or others, the commission shall state its findings of fact and conclusions of law and shall issue and * * * cause to be served on the respondent an order requiring the respondent to cease and desist from the unlawful discriminatory practice, requiring the respondent to take any further affirmative or other action that will effectuate the purposes of this chapter, including, but not limited to hiring, reinstatement, or upgrading of employees with or without back pay, or admission or restoration to union membership, and requiring the respondent to report to the commission the manner of compliance."

The common pleas court correctly modified some of the overbroad aspects of the commission's cease and desist order. Discrimination against Crouse and other mentally handicapped applicants was established because Miami's test did not fairly measure such applicants' abilities to perform the essential functions of the FSW dining hall position. Relief tied to that discrimination was appropriate. The commission can order Miami to consider mentally

retarded applicants based on their abilities and not based upon a test that does not measure those test takers' abilities to perform the essential functions of a particular job. However, any relief order that purports to *require* Miami to *hire* rather than fairly *consider for hiring* is still overbroad and not justified based either upon the discrimination found or on the commission's powers to remedy discrimination under the law.

█ It is beyond dispute that pursuant to its statutory authorization, the commission can order an employer to "cease and desist" from actions· that constitute discrimination. However, the statute further provides that the commission can require "affirmative or. other action." The import of this language is that rather than simply ordering that the discrimination cease, the commission can order the party who has been found to have discriminated to take positive action that will eliminate or remedy the established discrimination. If an individual has been discriminated against, that individual can be afforded relief tailored to the discrimination found. The examples given in the statute are examples of this type of individually based relief and include hiring, reinstatement, and so forth. However, the term "affirmative action" has been also applied to broader actions undertaken to remedy past discrimination, often on a voluntary basis, such as using special or different entrance examinations for minorities or women. Affirmative action in this sense does more than merely remedy an individual act of discrimination and has been the subject of intense debate and scrutiny in the courts and legislatures.

█ We do not believe that the commission has the power to order such sweeping *preferential* affirmative action in the absence of specific authorization from the legislature. In its regulations, the commission has provided that an employer who undertakes to implement a *voluntary* affirmative action plan will be entitled to "have that fact considered in any action to determine whether the employer has violated the handicap discrimination law." Ohio Adm.Code 4112–5–08(H)(1). The commission also includes the "institution of any affirmative action program with goals and timetables" in its list of permissible types of relief under all the anti-discrimination laws pursuant to the commission's jurisdiction. Ohio Adm.Code 4112–3–10(B)(1). Such relief would be authorized based on a conciliation agreement for *voluntary* compliance as outlined in Ohio Adm.Code 4112–3–03(D).[11] However, our research has revealed no authority from the legislature

---

11. Ohio Adm.Code 4112–3–03(D) on conciliation agreements provides:

"If, as a result of conference and conciliation, the commission is able to provide for *voluntary* compliance with sections 4112.01 to 4112.08 of the Revised Code, and to effect the elimination of any unlawful discriminatory practices, whether against the complainant or others, it may prepare a conciliation agreement which shall set forth all measures to be taken by the parties thereto, *including provisions for affirmative and other relief, goals and timetables,*

mandating affirmative action in the sense of preferential treatment for handicapped individuals.

Federal law is again instructive. The Eleventh Circuit Court of Appeals has recently held that although the ADA has broad remedial goals, it does not mandate any type of preferential affirmative action program:

"We cannot accept that Congress, in enacting the ADA, intended to grant preferential treatment for disabled workers. * * * '[T]he Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals.' * * * '[W]e do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled. It prohibits employment discrimination against qualified individuals with disabilities, no more and no less.' " (Citations omitted.) *Terrell v. USAir* (C.A.11, 1998), 132 F.3d 621, 627.

The Ohio Supreme Court has noted that "[t]he authority to take 'affirmative action' may well include extensive powers to effectuate the purpose of the Civil Rights Acts, but, under existing statutory language, those powers are to be directed towards ending the unlawful discriminatory practice and securing compliance with the cease and desist order." *Ohio Civ. Rights Comm. v. Lysyj* (1974), 38 Ohio St.2d 217, 222, 67 O.O.2d 287, 290, 313 N.E.2d 3, 7. Therefore, the Supreme Court held that the commission was not authorized to award compensatory or punitive damages if the legislature had not explicitly so provided. *Id.* See, also, *Jackson v. Ohio Civ. Rights Comm.* (1989), 50 Ohio App.3d 13, 552 N.E.2d 237 (restitution not authorized under commission's power to order "affirmative action" where legislature had not explicitly so provided in R.C. 4112.05[G]).

The unlawful discriminatory practice here was the use of the test to completely eliminate Crouse and other mentally retarded applicants from consideration for a job. Because Crouse could perform the essential functions of an identified job, the test was shown to be unlawfully discriminatory. However, Miami did not discriminate by failing to implement an affirmative action program that would *require* the hiring of mentally retarded applicants. Miami could and perhaps should voluntarily undertake such a program, and Miami should also carefully consider its duties as a grantee under *federal* program requirements[12]; however,

---

and compliance reports. * * * An executed conciliation agreement is a final order of the commission for the purposes of section 4112.06 of the Revised Code." (Emphasis added.)

**12.** The hearing examiner cited a case (*Fowler v. United States* [C.A.8, 1980], 633 F.2d 1258) involving not a federal grantee, but a federal agency employer, the post office. The federal

we hold that Ohio's handicap discrimination law, like the ADA, requires only that Miami be ordered not to discriminate against individual applicants. Miami cannot be ordered to preferentially "hire mentally retarded individuals." Therefore, the common pleas court's relief order is modified as follows:

Miami University is given a period of one hundred twenty days to present a plan to the commission that describes how mentally handicapped individuals will be considered for employment in Food Service Worker positions and any other position at Miami, for which they may be otherwise qualified.[13] Job coaching through MVI is a reasonable accommodation; however, Miami may also evaluate its training program and investigate other means for accommodating mentally handicapped individuals. In all other respects, the common pleas court's review of the commission's cease and desist order is affirmed.

In its third assignment of error, Miami argues that it is governed by Ohio civil service requirements and therefore must use competitive tests.

Section 10, Article XV of the Ohio Constitution provides:

"Appointments and positions in the civil service of the state, the several counties, and cities, shall be made according to merit and fitness, to be ascertained, *as far as practicable,* by competitive examinations." (Emphasis added.)

Miami is not required to dispense with its reading and math test completely. Rather, Miami is required to accommodate mentally retarded applicants for FSW dining hall positions or any other positions that do not require extensive reading and math. Because it is not "practicable" to accommodate such applicants without modifying the competitive examination requirement, Miami falls within

government has affirmative action duties under the Rehabilitation Act which are more extensive than those required of persons receiving federal financial assistance under the Rehabilitation Act or those of private employers under the ADA. The Tenth Circuit Court of Appeals recently noted the significant differences among the three statutory provisions:

"Section 501 [of the Rehabilitation Act] requires federal agencies to develop affirmative action programs for the hiring, placement, and advancement of individuals with disabilities. * * * By contrast, neither section 504 of the Rehabilitation Act nor the ADA creates such affirmative action obligations. 'It is well established both by the statutory language and Supreme Court decisions interpreting the [Rehabilitation] Act that federal employers have greater duties to accommodate disabled workers * * * than the duties owed by federal grantees * * * or those owed by employers under the ADA.'" *Smith v. Midland Brake, Inc.* (C.A.10, 1998), 138 F.3d 1304, 1311. See, also, *Southeastern Community College v. Davis* (1979), 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980, 990–991 (State agencies only *encouraged* to adopt and implement affirmative action policies. Congress knew how to provide for affirmative action in those instances where it wished to do so.).

Thus, the hearing examiner erred when he imposed duties based on the affirmative action obligations of federal *agencies.*

13. Although most BSW positions may not be suitable for mentally retarded applicants, testimony indicated that Miami has some laborer positions that might be.

the constitutional exemption. Therefore, Miami's third assignment of error is overruled.

In their fourth assignment of error, Miami argues that Burger had withdrawn his charge and Crouse's charge did not survive her death. At the hearing, Burger testified that he was willing to withdraw his charge if it would help Crouse's charge proceed more expeditiously and that he indicated this in a letter to commission personnel. However, this letter does not appear to have been entered into evidence and there was no evidence that Burger's charge was ever formally withdrawn. Moreover, the commission consolidated Burger's charge with Crouse's for hearing. Even if Burger's charge had been formally withdrawn, the commission has authority, following a hearing, to issue a cease and desist order if it determines the respondent has engaged in any unlawful discriminatory practice, "whether against the complainant or others." (Emphasis added.) R.C. 4112.05(G)(1). Therefore, it is largely immaterial whether Burger's charge was ever formally withdrawn.

Finally, Miami argues that Crouse's complaint did not survive her death. Ohio's survival statute, R.C. 2311.21, provides:

"Unless otherwise provided, no action or proceeding in any court shall abate by the death of either or both of the parties hereto, except actions for libel, slander, malicious prosecution, for a nuisance, or against a judge of a county court for misconduct in office, which shall abate by the death of either party."

Survival statutes, being remedial in nature, are liberally construed. *Johnson v. Ohio Dept. of Mental Retardation* (Ct.Cl.1987), 35 Ohio Misc.2d 18, 520 N.E.2d 29. However, Crouse was not technically a party to this action. The commission brought the charge and the commission ordered relief. Crouse's death does not affect the validity of the charge or the relief ordered. Back pay is clearly among the types of relief that the commission may order. See R.C. 4112.05(G)(1). The award of back pay is not intended to punish the employer or to provide a windfall to the victim; the award is to compensate the victim. *Ohio Civ. Rights Comm. v. Lucas Cty. Welfare Dept.* (1982), 6 Ohio App.3d 14, 6 OBR 38, 451 N.E.2d 1246. The survival statute, though not strictly applicable, does indicate a public policy in favor of the survival of actions. Therefore, Miami's final assignment of error is overruled.

*Judgment affirmed.*

WILLIAM W. YOUNG and WALSH, JJ., concur.